# United States Court of Appeals
## For the First Circuit

---

No. 02-2401

SAVRY KEO,

Petitioner,

v.

JOHN D. ASHCROFT, Attorney General,

Respondent.

---

ON PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

---

Before

Lynch, Lipez and Howard, <u>Circuit Judges</u>.

---

<u>Martin J. McNulty</u> was on brief for petitioner.

<u>Russell J. Verby</u>, Attorney, Office of Immigration Litigation, <u>Robert D. McCallum, Jr.</u>, Assistant Attorney General, Civil Division, and <u>David V. Bernal</u>, Assistant Director, were on brief for respondent.

---

August 22, 2003

---

LYNCH, **Circuit Judge**.  Petitioner Savry Keo seeks review of the denial of his application for asylum and withholding of deportation.  Keo entered the United States on a visa in 1997 to visit family.  Several months later, Keo applied for asylum with the Immigration and Naturalization Service (INS), claiming he feared persecution in light of a violent coup d'état that had taken place in his native Cambodia.  After a hearing, an Immigration Judge (IJ) denied Keo's petition.  The Board of Immigration Appeals (BIA) affirmed the IJ's decision without opinion, and this petition followed.  We affirm.

**I.**

On June 6, 1997, Keo entered Los Angeles, California, to visit his mother and younger sister for a month and then return to Cambodia.  Only two days before his scheduled return flight, a bloody coup erupted in Cambodia during which the Cambodian People's Party (CPP) ousted from power the National United Front for a Neutral, Peaceful, Cooperative, and Independent Cambodia (FUNCINPEC).  Keo declined to return to his home country, citing various news reports of violence directed toward FUNCINPEC members.  Approximately two months after the outbreak of fighting, on September 19, 1997, Keo submitted an application for asylum to the INS.

Keo was given an assessment interview on February 25, 1999, after which the interviewing asylum officer recommended

against granting Keo asylum. On March 2, 1999, the INS commenced removal proceedings against Keo. Keo acknowledged that he was removable from the United States and sought asylum as well as withholding of removal. On March 15, 2000, a hearing was conducted on these issues before an IJ.

In Keo's asylum application and testimony, he explained that he had been employed as a police officer in Cambodia since 1980. Starting in 1993, when the United Nations sponsored elections in Cambodia, Keo began to develop preliminary ties with FUNCINPEC. He had previously been a member of the CPP because he viewed such political membership as a prerequisite to government employment. This suspicion was confirmed, according to Keo, when he was suspended from his job for three months in 1993 due to his contacts with the FUNCINPEC party. As Keo later acknowledged, though, this suspension was at least partially attributable to his failure to follow direct orders.

After returning to work from his suspension, Keo did not reestablish his ties with the FUNCINPEC party until 1996. At that time, he "secretly" joined FUNCINPEC through conversations with his general supervisor in the police department, Mr. Hosak, who Keo testified was a prominent member of the FUNCINPEC party. Shortly thereafter, Hosak promoted Keo to the rank of Lieutenant Colonel, which resulted in Keo's FUNCINPEC membership becoming widely suspected among his co-workers.

Keo testified that soon after learning of the CPP coup while in America, his wife, who remained in Cambodia, informed him that Hosak had been killed and that he too would be in danger if he returned to Cambodia. These warnings were substantiated, according to Keo, when a relative who had traveled from America to Cambodia reported that Keo remained an active target of the CPP due to his affiliations with FUNCINPEC, his status as a former CPP official, and his relationship with Hosak. The relative also noted that several weeks after the coup, CPP forces had entered and searched Keo's home. Additionally, Keo presented to the IJ three letters from people presently residing in Cambodia that indicated he would face imminent danger should he return. In one letter, a colleague of Keo's from the police force wrote that his fellow officers believe him to be a "traitor that . . . ran away from [his] responsibilities, country and nation." In another letter, written in 1999, Keo's uncle warned that the CPP "army came to the village . . . about 4-5 times looking for you" and "will always [be] looking for you."

After considering Keo's testimony and asylum application along with the asylum officer's assessment and a 1999 State Department report on human rights practices in Cambodia, the IJ found that Keo had "not established that if he were to return to Cambodia . . . he would be persecuted or [that he] has a well-founded fear of persecution." First, the IJ noted that while Keo

might legitimately fear retaliation or prosecution for abandoning his job as a police officer, such fears were not based on politically motivated persecution. Second, the IJ was not convinced that Keo's membership in FUNCINPEC was truly a matter of public knowledge in Cambodia, pointing out that Keo had testified that his membership was secret. Third, the IJ pointed out that even assuming that "it was not a secret that [Keo] was a member of the FUNCINPEC Party, that party presently is part of a coalition in Cambodia . . . and members of that party are sharing power with the CPP." The IJ denied Keo's requests for asylum and withholding of removal and granted his request for voluntary departure.

Pursuant to 8 C.F.R. § 1003.1 (a)(7) (2003) (formerly 8 C.F.R. § 3.1(e)(4)), the BIA affirmed the IJ's decision without opinion.

## II.

When faced with a substantial evidence challenge, this court reviews BIA decisions to determine whether they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (internal quotation marks omitted); Albathani v. INS, 318 F.3d 365, 372 (1st Cir. 2003). Where, as here, the BIA has summarily affirmed without opinion under 8 C.F.R. § 1003.1(a)(7), we treat the findings and conclusions of the IJ as those of the Board. Herbert v. Ashcroft, 325 F.3d 68, 71 (1st Cir.

-5-

2003). As such, the IJ's determination must stand unless we "find that the evidence not only <u>supports</u> [petitioner's] conclusion, but <u>compels</u> it." <u>Elias-Zacarias</u>, 502 U.S. at 481 n. 1; <u>Albathani</u>, 318 F.3d at 371.

Only applicants who qualify as a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42) are entitled to asylum. <u>See</u> <u>id.</u> § 1158(b)(1); 8 C.F.R. § 208.13(a) (2000). Two routes are available to meet this standard. First, an applicant can qualify as a refugee if he or she carries the burden of demonstrating a well-founded fear of future persecution on the basis of one of five statutory factors: race, religion, nationality, membership in a particular social group, or political opinion. <u>Id.</u> § 208.13(b)(1); <u>El Moraghy</u> v. <u>Ashcroft</u>, 331 F.3d 195, 202-03 (1st Cir. 2003). To do so, an applicant must demonstrate that his or her fear is both genuine and objectively reasonable. <u>See</u> <u>Aguilar-Solis</u> v. <u>INS</u>, 168 F.3d 565, 572 (1st Cir. 1999). Alternatively, an applicant has a presumption of a well-founded fear of future persecution if he or she carries the burden of showing past persecution on the basis of one of the statutory factors. <u>El Moraghy</u>, 331 F.3d at 202-03; <u>Yatskin</u> v. <u>INS</u>, 255 F.3d 5, 9 (1st Cir. 2001).

Although Keo claimed in his asylum application that he was subject to past persecution from 1975 until 1979 at the hands of the Khmer Rouge, his appeal rests primarily on the claim that he has a well-founded fear of future persecution. Keo argues that the

IJ's conclusion to the contrary was not based on substantial evidence and that the IJ improperly relied on adverse credibility determinations that were the result of difficulties in translating Keo's testimony from Khmer to English. After a careful review of the record, we find that the evidence does not compel a conclusion contrary to that reached by the IJ, and thus we affirm.

Even if Keo has a genuine fear of returning to his native Cambodia, the record does not compel the conclusion that this fear derives from the threat of persecution on the basis of Keo's political beliefs. As the IJ noted in his decision, and as Keo admitted in his testimony, the FUNCINPEC party now retains some authority in a new coalition government that formed in Cambodia in November 1998. Keo's status as a member of FUNCINPEC does not compel the conclusion that he would be in danger should he return to Cambodia. Moreover, the IJ had sufficient evidence to find that Keo's ties to FUNCINPEC are not a matter of public knowledge in Cambodia. Accepting that some of Keo's testimony was ambiguous due to translation difficulties, Keo was ultimately quite clear that he did not officially join FUNCINPEC until 1996, and, even then, did so secretly. And while Keo also testified that this secret was discovered when Hosak promoted him, the IJ had sufficient evidence to find that Keo had not met his burden of establishing that his FUNCINPEC membership was a matter of public knowledge. Finally, much of the evidence that Keo presented -- in particular the three

letters warning him of danger should he return to Cambodia -- suggested that any danger Keo might face in Cambodia would stem from his co-workers' perception that he "abandoned" his country by not returning to his official duties after the coup.  As both the IJ and the interviewing asylum officer noted, any such reaction is not based on Keo's race, religion, nationality, membership in a particular social group, or political opinion.

For the same reasons, we decline to upset the IJ's refusal to grant withholding of removal.  See Mediouni v. INS, 314 F.3d 24, 27 (1st Cir. 2002) ("Because the standard for withholding deportation is more stringent than that for asylum, a petitioner unable to satisfy the asylum standard fails, a fortiori, to satisfy the former." (internal quotations omitted)).

## III.

We **affirm** the decision of the BIA denying the application for asylum and withholding of removal; the order permitting voluntary departure stands.