# United States Court of Appeals
## For the First Circuit

No. 04-2526

RONKE AKINFOLARIN,

Petitioner,

v.

ALBERTO GONZALES,
Attorney General of the United States,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Boudin, <u>Chief Judge</u>,
Lynch and Howard, <u>Circuit Judges</u>.

<u>Mark B. Laroche</u> on brief for petitioner.
<u>Jocelyn Lopez Wright</u>, Assistant Director, Office of Immigration Litigation, Civil Division, United States Department of Justice, <u>Peter D. Keisler</u>, Assistant Attorney General, and <u>Kristin K. Edison</u>, Law Clerk, on brief for respondent.

September 13, 2005

**LYNCH**, **Circuit Judge**. Petitioner Ronke Akinfolarin, a native and citizen of Nigeria, seeks review of a final order of removal issued by the Board of Immigration Appeals (BIA), which affirmed, without opinion, the Immigration Judge's (IJ's) denial of her application for asylum, withholding of removal, and relief under the United Nations Convention Against Torture (CAT). We deny the petition for review.

**I.**

Akinfolarin entered the United States as a visitor on January 4, 1993. On or about April 4, 1994, she filed an application for asylum with the former Immigration and Naturalization Service (INS).[1] Subsequently, she departed the United States on advanced parole and was reparoled on February 3, 1996. The INS interviewed Akinfolarin about her asylum application on June 13, 2000 and commenced removal proceedings against her thirteen days later.

At the removal hearing, Akinfolarin conceded removability, but sought asylum, withholding of removal, relief under the CAT, and, in the alternative, voluntary departure. In support of her petition, she provided a graphic account of violence at the hands of religious fanatics. Prior to departing from

---

[1] On March 1, 2003, the relevant functions of the INS were transferred to the Department of Homeland Security, and the INS subsequently ceased to exist. See Homeland Security Act of 2002, Pub. L. No. 107-296, § 471, 116 Stat. 2135, 2205 (codified as amended at 6 U.S.C. § 291(a)).

Nigeria, Akinfolarin recounted, she served as a secretary for the Federal Ministry of Works. In January 1991, she and her brother, also a government employee, were transferred from Lagos, the former capital, to Abuja, the current one. Upon their arrival, the siblings, both Muslim, joined a new mosque. In August 1992, a friend warned them that the other members of the mosque were Maitatsine,[2] a religious sect that allegedly "practice[d] killing [humans] and drinking their blood." Two months later, Akinfolarin said, an imam invited her and her brother to a special prayer meeting that began at 1 a.m., much later than the customary service hour of 1 p.m. Concerned that the members of the mosque were, indeed, Maitatsine, the siblings arrived at the meeting earlier than the appointed time. According to Akinfolarin's testimony, peeking through a window, they saw "a couple of people tied down," one of whose "throat was sliced." The siblings then returned to their house. Shortly after, they heard a knock at their door, and Akinfolarin's brother opened it, against her instructions. Akinfolarin said that, from under the bed, where she was hiding with her six-day-old baby, she saw four men whom she recognized from the mosque push down her brother and "cut [him] with a dagger, a knife on his throat." By her account, there was "blood all over the place," and she could "hear him gagging." After "at least one

_____

[2] The sect's name is sometimes spelled "Matezena" in the record. We employ the spelling used by the parties in their briefs.

hour," she screamed for help. At the hearing, Akinfolarin testified that her brother died "in the middle of [that] night" in their home in Abuja. She brought his corpse back to Lagos the following morning, first to the hospital, then to be buried. She did not, however, go to the authorities, crediting rumors that "some of the police are [Maitatsine]."

Subsequent to her brother's death, Akinfolarin resided for twelve months in Lagos, after which she departed for the United States on a visitor visa and applied for asylum. She stayed in the United States until January 16, 1996, when she was granted advance parole to return to Nigeria for two weeks to attend the burial of her mother. While in Nigeria and en route from visiting a friend named Joyce, Akinfolarin reported, two[3] men "jumped" her in Abuna Agage. She identified the men by their dress as Maitatsine, but conceded that they were not the same men who killed her brother. When asked how the Maitatsine knew of her return to Nigeria, she said she did not know but speculated that Joyce had "changed" and "had something to do with" the attack. Akinfolarin stated that she sustained lacerations in her left arm and right foot in the attack. Moreover, she testified that the attack left her afraid to return to Nigeria; she averred that if she were to do so, she would be killed by the Maitatsine, who "are all over."

---

[3] Moments later in the hearing, Akinfolarin testified that "three people" attacked her in Abuna Agage.

-4-

After considering Akinfolarin's testimony and evidentiary submissions, the IJ delivered an oral opinion. The IJ first addressed the admissibility of Akinfolarin's evidence, noting her rejection of various documents, including an amended asylum application and a psychiatric affidavit. She then decided against Akinfolarin on her claims for asylum and withholding of removal, concluding that because "the case just doesn't appear to be a true case," Akinfolarin had failed to prove past persecution or a well-founded fear of future persecution. Also, the IJ determined that Akinfolarin did not establish eligibility for protection under the CAT because she failed to make "any claim that the authorities in Nigeria would subject her to torture." Finally, the IJ found that Akinfolarin "is not entitled to voluntary departure insofar she is an arriving alien." Akinfolarin timely appealed to the BIA, which summarily affirmed.[4] She then timely petitioned for review by this court.

## II.

Akinfolarin makes three claims on review. First, she contends that the IJ erred by refusing to admit her amended asylum

[4] Contemporaneously with the filing of her petition before this court, Akinfolarin also filed a motion to reconsider with the BIA, which denied the motion on March 8, 2005. Akinfolarin did not timely file a petition for review of the denial of the motion to reconsider. Thus, although the record contains certain administrative filings that post-date the BIA's October 12, 2004 affirmance of the IJ's decision, this court disposes of the instant petition solely on the basis of the administrative record as of October 12, 2004.

-5-

application and psychiatric affidavit. Second, she argues that the IJ's denial of her asylum and withholding of removal claims was not supported by substantial evidence. Finally, she submits that the IJ erred in classifying her as an "arriving alien" and thereby concluding that she was statutorily ineligible for voluntary departure. Since the BIA summarily affirmed without opinion, we adjudicate all three claims with reference to the findings and the conclusions of the IJ. See 8 C.F.R. § 1003.1(e)(4); Jupiter v. Ashcroft, 396 F.3d 487, 490 (1st Cir. 2005); Keo v. Ashcroft, 341 F.3d 57, 60 (1st Cir. 2003).

With regard to the first claim, Akinfolarin must show that the IJ's exclusion of evidence was an abuse of discretion and that she was prejudiced as a result. See Galicia v. Ashcroft, 396 F.3d 446, 447-48 (1st Cir. 2005). This deferential standard of review reflects our determination that "[a]n immigration judge, like other judicial officers, possesses broad (though not uncabined) discretion over the conduct of trial proceedings." Sharari v. Gonzales, 407 F.3d 467, 476 (1st Cir. 2005) (quoting Aguilar-Solis v. INS, 168 F.3d 565, 568 (1st Cir. 1999)).

We determine under this standard that Akinfolarin has no valid procedural claim as to either of the excluded documents. Akinfolarin waited until the day of the removal hearing -- actually her third appearance before the IJ -- to proffer the amended asylum application. Moreover, that filing contained information that

-6-

contradicted her trial testimony. Specifically, the amended I-589 listed her sons' names as "Eric B. Olodapo" and "Jeffrey Olalikin"; however, during the course of her testimony, Akinfolarin asserted that her older son's name is "Eric Babatunde," while her younger child's name is "Jeffrey Olodapo." When questioned, Akinfolarin failed to satisfactorily account for the inconsistencies or to present any additional information, such as authenticated birth certificates, capable of independently verifying the information she gave regarding her children. Although an "immigration judge having jurisdiction may permit an asylum applicant to amend . . . the application," see 8 C.F.R. § 208.4(c), there was no abuse of discretion in the IJ's refusing such an untimely and unreliable filing. See Galicia, 396 F.3d at 448 (finding no error in IJ's refusal to admit documents that were late, incomplete, and not properly formatted); Chay-Velasquez v. Ashcroft, 367 F.3d 751, 756 (8th Cir. 2004) (finding no error in IJ's declining to admit untimely supplement to asylum application).

Nor was there error in the IJ's refusal to admit the psychiatric affidavit. The affidavit, which was prepared by a doctor who was not made available at the hearing, was created in March 2002 as a result of a one-time consultation and had not been updated since; the IJ determined that the underlying consultation "wasn't a thorough enough exam" for her to "really give any credence to this finding." More significantly, the IJ expressed

concern that the affidavit contained information that contradicted Akinfolarin's own testimony. Indeed, Akinfolarin failed to articulate a persuasive explanation for the following discrepancies, among others: First, the affidavit identified petitioner as the eleventh of twelve children, although she claimed at the hearing that she has no living siblings and that her sole brother died. Second, it noted that she moved from Lagos to Abuja in 1992, though she testified that she moved in 1991. Third, it reported that she saw only one man tied down at the 1 a.m. prayer meeting, whereas at the hearing, she reported that she clandestinely observed "a couple of people tied down." Given such reliability concerns, the IJ did not abuse her discretion in declining to admit the affidavit.

Finally, we note that even if there had been error in the IJ's refusal to admit the evidence, the error would not have prejudiced Akinfolarin. The IJ made it clear that she would not have given much credence to these materials, given the discrepancies between the information contained therein and that relayed during Akinfolarin's testimony. Cf. Chay-Velasquez, 367 F.3d at 756 (finding no abuse of discretion in an IJ's refusal to admit late filings, where the refusal did not prejudice petitioner because the supplemental materials "would not have affected the basis for denying him relief").

-8-

Akinfolarin next challenges the IJ's denial of her asylum and withholding of removal claims. We review the denial of her claims under the deferential substantial evidence standard. See INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992); Akinwande v. Ashcroft, 380 F.3d 517, 522 (1st Cir. 2004). Under the substantial evidence test, the IJ's determination must stand "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see also Rodriguez-Ramirez v. Ashcroft, 398 F.3d 120, 123 (1st Cir. 2005). As to issues of credibility, we give great deference to an IJ's determinations so long as the IJ provides "specific reasons for those determinations." Akinwande, 380 F.3d at 522.

We begin by considering Akinfolarin's application for asylum, noting that "[b]ecause the 'more likely than not' standard for withholding deportation is more stringent than that for asylum, a petitioner unable to satisfy the asylum standard fails, a fortiori, to satisfy the former." Albathani v. INS, 318 F.3d 365, 372 (1st Cir. 2003). An asylum applicant bears the burden of establishing that she qualifies as a "refugee" and thus is eligible for asylum. See 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 1208.13(a). Meeting this burden requires proving past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political

opinion.  8 U.S.C. § 1101(a)(42)(A); see also Qin v. Ashcroft, 360 F.3d 302, 306 (1st Cir. 2004).  Although an asylum applicant's testimony "may be sufficient to sustain the burden of proof without corroboration," such testimony must be credible.  Settenda v. Ashcroft, 377 F.3d 89, 93 (1st Cir. 2004) (quoting 8 C.F.R. § 1208.13(a)) (internal quotation marks omitted).

Substantial evidence supports the IJ's determination that Akinfolarin failed to substantiate either her claim of past persecution or her fear of future persecution.  As the IJ concluded, "the case just doesn't appear to be a true case."  In support of her adverse credibility determination, the IJ pointed to -- and the record is riddled with -- unresolved discrepancies among Akinfolarin's testimony, evidentiary submissions, and asylum papers.  For instance, Akinfolarin testified that her brother died in the middle of the night in Abuja; however, the documents she submitted to bolster her account report that her brother died in a hospital in Lagos at 6:15 p.m.  Moreover, the IJ found it "peculiar" that Akinfolarin "has not one reliable document to show this Court"; indeed, she failed to produce birth certificates for either of her children or employment records from Nigeria.  Of the evidentiary materials Akinfolarin did proffer, most were rejected by the IJ either because notary seals and other information on the face of the documents showed that "they could not [have] been issued when they claimed to have been issued" or because

"respondent's testimony [revealed] that they were not in fact contemporaneous record[s] as they appear to purport to be."

Adverse credibility determination aside, we agree with the IJ that "there simply is just not objective evidence" to establish that Akinfolarin was or would be harmed on account of any of the five statutory grounds. Without crediting speculation, there is no nexus between Akinfolarin's brother's death and her 1996 attack: the two events lacked temporal and geographical proximity, and Akinfolarin gave no objective reasons for believing that her brother's assailants or their associates knew of her return to Nigeria. Additionally, as the IJ observed, the fact "that she was a victim or may have been the victim of a crime in January of 1996 when she returned to Nigeria" does not prove that she was targeted for harm by one particular group or on account of one of the five statutory grounds. One -- or even two -- criminal acts does not persecution necessarily make.[5] See Rodriguez-Ramirez, 398 F.3d at 124 ("[N]ot all horrific experiences translate into persecution."). Finally, however traumatic events were in Abuja, Akinfolarin testified that she resided for a year, without incident, in Lagos after her brother's death. That, along with the

---

[5] The IJ never directly reached the question whether the purported persecution was sponsored by the government or merely private. See Harutyunyan v. Gonzales, No. 04-2207, slip op. at 9 (1st Cir. Sept. 2, 2005); Da Silva v. Ashcroft, 394 F.3d 1, 7 (1st Cir. 2005). She did, however, observe that "there is no evidence that the [Nigerian] government would be unable to protect" Akinfolarin.

-11-

fact that, according to her own evidence, the Nigerian government has begun since 1998 to crack down on Maitatsine fanatics, militates against a finding of a well-founded fear of persecution. See Quevedo v. Ashcroft, 336 F.3d 39, 42, 44 (1st Cir. 2003).

In sum, the record does not compel a rejection of the IJ's determination that Akinfolarin failed to substantiate past persecution or a fear of future persecution. She thus also fails to satisfy the standard for withholding of deportation.[6] See Albathani, 318 F.3d at 374; Velasquez v. Ashcroft, 316 F.3d 31, 33 n.2 (1st Cir. 2002).

## IV.

Finally, Akinfolarin argues that the IJ erred as a matter of law in classifying her as an "arriving alien," see 8 C.F.R. § 1001.1(q), which made her statutorily ineligible for voluntary departure. See 8 U.S.C. § 1229c(a)(4). This court lacks jurisdiction to review denials of voluntary departure. See id. § 1252(a)(2)(B)(i) (divesting the courts of jurisdiction over "any judgment regarding the granting of relief under" § 1229c); id.

---

[6] Akinfolarin also argues that the IJ abused her discretion in failing to grant relief under 8 C.F.R. § 208.13(b)(1)(iii), which allows for a discretionary grant of asylum in the absence of a well-founded fear of persecution. Such discretionary relief is available only upon a threshold finding that the applicant suffered past persecution within the meaning of 8 C.F.R. 208.13(b)(1). Because we find that substantial evidence supports the IJ's determination that Akinfolarin did not suffer past persecution, Akinfolarin's claim for discretionary relief necessarily also fails.

-12-

§ 1229c(f); <u>Bocova v. Gonzales</u>, 412 F.3d 257, 265 (1st Cir. 2005) (recognizing that Congress has "stripp[ed] the courts of appeals of jurisdiction to review BIA decisions as to whether to grant voluntary departure"). We do not reach the question whether this statutory proscription extends to review of statutory eligibility for voluntary departure[7] because, as the government points out, prior to petitioning this court for review, Akinfolarin never once contested her classification as an arriving alien: the Notice to Appear designated her as an arriving alien; she admitted, and the IJ confirmed her admission of, the allegations therein; and she made no protest when the IJ twice identified her as an arriving alien during the removal proceedings. There was thus no error to the IJ's finding that she was not entitled to voluntary departure.

**V.**

The petition for review is **denied**.

---

[7]<u>See</u> <u>Tovar-Landin</u> v. <u>Ashcroft</u>, 361 F.3d 1164, 1166 (9th Cir. 2004) (construing 8 U.S.C. §§ 1252(a)(2)(B)(i) and 1229c(f) to preclude review of "denials of voluntary departure, including statutory eligibility for voluntary departure"). <u>But</u> <u>cf.</u> <u>Succar</u> v. <u>Ashcroft</u>, 394 F.3d 8, 19 (1st Cir. 2005) (noting, in another context, that 8 U.S.C. § 1252(a)(2)(B)(i) did not entirely eliminate judicial review of purely legal questions).