# United States Court of Appeals
## For the First Circuit

No. 05-1308

BRIAN COLBURN,

Plaintiff, Appellant,

v.

PARKER HANNIFIN/NICHOLS PORTLAND DIVISION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Lynch, Circuit Judge,
Campbell and Stahl, Senior Circuit Judges.

Howard T. Reben, with whom Adrienne S. Hansen and Reben,
Benjamin & March were on brief, for appellant.
Frederick B. Finberg, with whom Peter Bennett and The Bennett
Law Firm, P.A. were on brief, for appellee.

November 18, 2005

**LYNCH, Circuit Judge.** Brian Colburn was terminated from his job as a machine operator at the Nichols Portland Division of the Parker Hannifin Corporation ("Nichols"). Colburn sued, alleging primarily that his employer, Nichols, fired him in retaliation for his having taken leave protected under the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. §§ 2601-54, and the similar Maine statute, Me. Rev. Stat. Ann. tit. 26, §§ 843-48. In turn, Nichols responded that it had discharged Colburn because he told the company he was out sick with a migraine when he was seen going to the gym, shopping, and driving around doing errands.

We affirm summary judgment in favor of the defendant on different grounds than those used by the district court and the magistrate judge. In doing so, we reject certain reasoning urged on those courts by the defendant. We hold that a claim for retaliatory discharge from employment is not extinguished by a finding that the plaintiff was unable to return to work at the expiration of his 12-week period of FMLA leave. Nonetheless, we hold that no reasonable jury could conclude that this particular plaintiff was fired in retaliation for his exercise of FMLA rights.

**I.**

We recount the facts in the light most favorable to the plaintiff, who opposed the entry of summary judgment. Crete v. City of Lowell, 418 F.3d 54, 56 (1st Cir. 2005). In January 1998, Nichols hired plaintiff Colburn as a utility worker. During the

-2-

next four years, Colburn was promoted four times; he eventually held the position of Machine Operator I, with responsibility for troubleshooting machines, as well as for some training of other machine operators.

On October 2, 2001, during his lunch break at work, Colburn experienced what would turn out to be the first of many intensely painful migraines. Although he had suffered from sinus-related headaches in the past, the new wave of migraines was more severe and often accompanied by shooting pain, blurry vision, dizziness, or nausea. From October 17 to 22, 2001, Colburn went on a prescheduled hunting vacation. When he returned to work on October 23, he experienced a migraine a half hour into his shift at Nichols and had to leave work. From then on, he began to take intermittent sick leave on account of his migraines; he missed twenty-five days' work between October 2001 and January 31, 2002.

In autumn of 2001, Colburn filed with Nichols an application for short-term disability benefits. In that application, dated November 22, 2001, he stated that he was unable to perform "[a]ll activities when an attack occurs[,] including driving." The application was never finalized. On at least three occasions in December 2001, Shannon Craig, a human resources representative, requested from Colburn medical information that the company needed to substantiate his need for medical leave and to determine his eligibility for disability benefits. According to

Craig's record of their conversations, Colburn repeatedly promised to submit the paperwork, but failed actually to do so. Colburn concedes that he did not submit any of the requested medical documents to the company. He now argues that at the time he filed the application, he had signed an authorization to release medical information that gave Nichols access to all of his medical records; accordingly, the onus was on Nichols to secure the necessary medical documents. At his deposition, however, he never testified that he had told Craig that she should get the medical records herself using his authorization.

Colburn asserted in his affidavit that while he was on leave, he frequently provided complete updates to his employer about his health. He testified at his deposition that when he spoke with Randy Purinton, his immediate supervisor, Purinton never put pressure on him to return to work or subjected him to criticism or discipline. In December 2001, however, Colburn spoke with Christine Fox, a human resources administrator at Nichols, about his medical condition. Colburn stated in his affidavit that Fox used a hostile tone and made him "feel like [he] was doing something wrong for making a medical claim."

On January 22, 2002, Nichols retained a private investigator to conduct surveillance of Colburn. Nichols states that it initiated the investigation because it became suspicious of Colburn for two reasons: first, Colburn failed to submit the

medical information the company needed to process his disability application, despite three requests by human resources personnel, and second, he could not be reached at home on days when he had called in sick.

The investigator began surveillance of Colburn on January 23 and 24; Colburn reported for work on both days. On January 28 and 29, Colburn was scheduled to work the 2:30 p.m. to 11:00 p.m. shift. Sometime around 2 p.m. on January 28, Colburn called his supervisor to say that he had a severe headache and would not be able to come into work until later in the afternoon. Around 3 p.m., the investigator followed Colburn as he drove from his home to a gym. Thirty minutes after entering the gym attired in workout clothes, Colburn departed in jeans and a shirt. Colburn then drove to a video store, where he rented a video, and then to three variety stores. He emerged at 5:05 p.m. from the third store with a paper bag containing what appeared to be two bottles. Around the same time, he left a voicemail for his supervisor apprising him that his migraine had returned and that he would not be coming into work at all that day. At that point, the investigator lost sight of Colburn in heavy traffic. The investigator returned to Colburn's residence at 5:53 p.m. and, upon seeing that Colburn was in his garage, apparently gathering items from his car and preparing to go inside the house, discontinued surveillance for the day.

Upon resuming surveillance on January 29, 2002, the investigator observed Colburn departing from his home at 12:35 p.m. The investigator tracked Colburn as he drove to multiple locations: he went into his gym for about thirty minutes, rented videos from two video stores, and stopped at a bank. Colburn also visited two shopping areas, where he seemed to have been searching for a payphone. Around 2 p.m., Colburn left a voicemail for his supervisor indicating that he was ill and would not be able to work that day. After making that phone call, Colburn stopped at a variety store; there, he purchased a six-pack of beer and some pretzels. He did not return home until after 3:30 p.m., at which point the investigator discontinued surveillance.

On January 31, 2002, Jan Stanley, Nichols's human resources manager, received from the investigator a report detailing his observations during the course of his surveillance of Colburn. Later that day, company officials Steve Oliver and Harold Sexton, along with Randy Purinton, met with Colburn and informed him that he was being discharged. Colburn testified at his deposition that his understanding after that meeting was that they had terminated him in part because he had been observed at the gym at the same time he had called in sick. Stanley confirmed in deposition testimony that Colburn had been fired because his actions on January 28 and 29 were inconsistent with those of someone experiencing an incapacitating migraine. She also

testified that Nichols has a "positive progressive discipline policy," under which employees usually receive some notice of, and opportunity to address, the employer's disciplinary concerns. However, under that policy, serious misconduct can result in immediate dismissal of the employee.

Both parties agree that at the time he was fired, Colburn had not exhausted the full 12-week leave period to which he was entitled under the FMLA. See 29 U.S.C. § 2612(a), (b). In key testimony, he admitted at his deposition that he "was unable to return to work due to his medical condition until 4/15/03," well past the expiration date of his FMLA leave. Stanley testified that Colburn was on unpaid leave at the time of his termination.

Colburn said at his deposition that he had no recollection of whether he had called in sick on January 28 and 29. Nor did he recall what he did those days if he had called in sick. He later acknowledged that he did, in fact, engage in the activities depicted in the surveillance tape. He argued, however, that the activities documented in the video were not "inconsistent with his having a migraine which prevented him from working"; he suggested that "he was most likely experiencing the onset or aftermath of a migraine, which did not prevent him from functioning at the minimal levels shown on the video."

## II.

Colburn filed suit on January 15, 2004 in federal district court against Nichols, alleging violations of the FMLA, 29 U.S.C. §§ 2601-54, and the similar Maine statute, Me. Rev. Stat. Ann. tit. 26, §§ 843-48.[1] He made two FMLA claims. First, he alleged that Nichols interfered with his substantive rights under the FMLA by failing to restore him to his position following the termination of his FMLA leave, in violation of 29 U.S.C. § 2614. Second, he alleged that Nichols fired him in retaliation for his taking medical leave, in violation of 29 U.S.C. § 2615.

After the close of discovery, Nichols filed on August 2, 2004 a motion for summary judgment on all counts of the complaint. On October 8, 2004, a magistrate judge filed a recommended decision granting Nichols's summary judgment motion. After oral argument, the district court, on de novo review, issued an order on January 25, 2005 that adopted the magistrate judge's recommendation to grant defendant's summary judgment motion as to all counts of the complaint and to strike certain sections of Colburn's summary judgment affidavit. Colburn appeals both of these rulings.

---

[1] The parties have assumed that the same legal analysis governs both the federal and state claims. Both the magistrate judge and the district court proceeded with that assumption. We do so as well.

-8-

Review of a district court's grant of summary judgment is de novo, Rodriguez v. Am. Int'l Ins. Co., 402 F.3d 45, 46-47 (1st Cir. 2005), and we may affirm the district court's decision on any sufficient ground supported by the record, Carcieri v. Norton, 423 F.3d 45, 53 (1st Cir. 2005).

Our review of this otherwise straightforward case has been complicated by some analytic confusion, largely caused by the defendant. We clarify the law and affirm summary judgment on the basis that there is insufficient evidence for a rational factfinder to conclude that Nichols interfered with Colburn's substantive rights under the FMLA or that it terminated him in retaliation for his taking medical leave.

## A.        FMLA Standards

The FMLA contains two distinct types of provisions: those establishing substantive rights and those providing protection for the exercise of those rights. See Hodgens v. General Dynamics Corp., 144 F.3d 151, 159-60 (1st Cir. 1998). The first, which we have described as "essentially prescriptive, 'set[s] substantive floors' for conduct by employers, and creat[es] 'entitlements' for employees." Id. at 159 (quoting Diaz v. Fort Wayne Foundry Corp., 131 F.3d 711, 712-13 (7th Cir. 1997)). Such provisions, codified at 29 U.S.C. § 2612, entitle eligible employees to, inter alia, "a total of 12 workweeks of leave," which may be taken intermittently

when medically necessary, for "a serious health condition that makes the employee unable to perform the functions of [his] position." 29 U.S.C. §§ 2612(a)(1)(D), 2612(b). With limited exceptions, see 29 C.F.R. §§ 825.214(b), .216, upon the employee's return from a qualified leave, the employer must reinstate the employee to the same position or an alternate position with equivalent pay, benefits, and working conditions, and without loss of accrued seniority. Hodgens, 144 F.3d at 159 (citing 29 U.S.C. § 2614(a)(1); and 29 C.F.R. § 825.100(c)); see also Hillstrom v. Best W. TLC Hotel, 354 F.3d 27, 32 (1st Cir. 2003).

In addition to the grant of substantive rights, the statute sets forth a list of prohibited acts at 29 U.S.C. § 2615:

> (a) Interference with rights
>
>> (1) Exercise of rights
>> It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.
>>
>> (2) Discrimination
>> It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.
>
> (b) Interference with proceedings or inquiries
>
> It shall be unlawful for any person to discharge or in any other manner discriminate against any individual because such individual --

(1) has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this subchapter;

(2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under this subchapter; or

(3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this subchapter.

The statute prohibits, then, both interference and discrimination. Notably, however, there is no clear demarcation in § 2615 between what is "interference" and what is "discrimination," and the terms overlap in some situations. See, e.g., Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 143-47 & n.9 (3d Cir. 2004); Bachelder v. Am. W. Airlines, 259 F.3d 1112, 1124 n.10 (9th Cir. 2001). Employers found to be in violation of 29 U.S.C. § 2615 are subject to a claim for, inter alia, equitable relief and compensatory damages, including wages, salary, and benefits.

Claims for violations of substantive rights are brought under 29 U.S.C. § 2615(a)(1), which prohibits actions by "any employer to interfere with, restrain, or deny the exercise of" such rights. See, e.g., Harrell v. U.S. Postal Serv., 415 F.3d 700, 706-07 (7th Cir. 2005); see also 7 N. Lareau et al., Labor and Employment Law § 174.02[3] (2003). To meet his or her burden in an interference with substantive rights claim, a plaintiff need only

show, by a preponderance of the evidence, entitlement to the disputed leave; no showing as to employer intent is required. See Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 960-61 (10th Cir. 2002); King v. Preferred Technical Group, 166 F.3d 887, 891 (7th Cir. 1999).

In addition to a claim alleging the deprivation of substantive rights, an employee may also bring suit against an employer under a retaliation theory. Although the text of 29 U.S.C. § 2615(a) makes no reference to "retaliation," this court has recognized such a cause of action in the statute and specifically the interpretative regulation 29 C.F.R. § 825.220(c).[2] Hodgens, 144 F.3d at 160-61 & n.4 (1st Cir. 1998) (citing 29 U.S.C. § 2615(a)(1), (2); and 29 C.F.R. § 825.220(c)); see also Keeler v. Putnam Fiduciary Trust Co., 238 F.3d 5, 8-9 (1st Cir. 2001).

The regulation 29 C.F.R. § 825.220(c) provides:

> An employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave. For example, if an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on

---

[2] As best as we can tell, all circuits recognize a cause of action for retaliation. Most ground it in 29 U.S.C. § 2615(a)(1) and (2) and attendant regulations. See, e.g., Strickland v. Water Works & Sewer Bd., 239 F.3d 1199, 1206-07 (11th Cir. 2001); King, 166 F.3d at 891. But some derive it only from § 2615(a)(2) and the accompanying regulations and appear to reserve § 2615(a)(1) for non-retaliation claims. See Conoshenti, 364 F.3d at 146 n.9 (discussing the two approaches and citing Arban v. West Publishing Corp., 345 F.3d 390, 401, 403 (6th Cir. 2003), as an example of the latter).

-12-

> unpaid FMLA leave.  By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under "no fault" attendance policies.

This regulation unambiguously interprets § 2615 as prohibiting retaliation.  However, it does not make any distinction among §§ 2615(a)(1), 2615(a)(2), or 2615(b) as the source of the prohibition.  This statutory and regulatory ambiguity has led to some differences in view.

Specifically, courts have disagreed about whether "interference" refers to a category of claims separate and distinct from those involving retaliation, or whether it describes a group of unlawful actions, of which retaliation is a part.  See Bachelder, 259 F.3d at 1124 & n.10.  The term "interference" may, depending on the facts, cover both retaliation claims, see Hodgens, 144 F.3d at 159-60 & n.4, and non-retaliation claims, see Conoshenti, 364 F.3d at 142-43.  The distinction would matter if the standards of proof used turned on which statutory section were pled, rather than on the nature of the facts and the theory of the case.  Yet, whether a claim is characterized as "interference" or not, its elements actually differ depending on whether the plaintiff is, at bottom, claiming that the employer denied his or her substantive rights under the FMLA or that the employer retaliated against him or her for having exercised or attempted to exercise those rights.  Cf. Bachelder, 259 F.3d at 1124-25

-13-

(characterizing a claim under 29 C.F.R. § 825.220(c) as an "interference" claim, where plaintiff did not allege that the employer terminated her in retaliation for taking FMLA leave, but rather that the employer used her taking FMLA leave as a negative factor in its decision to terminate her).

For example, this circuit's approach to an FMLA claim of retaliation is to permit proof directly or by inference, with the ultimate burden of proof remaining on the plaintiff to prove by a preponderance of the evidence that the employer's adverse employment action was in retaliation for exercise of protected rights.  See Hodgens, 144 F.3d at 160.  In contrast, employer motive plays no role in a claim for substantive denial of benefits. See id. at 159; 1 C. Richey, Manual on Employment Discrimination Law and Civil Rights Actions § 9:42 (2d ed. 2004) (citing Diaz, 131 F.3d at 712-13).

In the present case, both the magistrate judge and district court concluded that plaintiff could not have made out a persuasive case under either the denial of substantive rights/interference theory or the retaliation theory.  Their conclusion was the only outcome warranted by the record.

**B.        Denial of Substantive Rights/Interference Claim**

The two courts noted that Colburn, by his own admission, would not have been able to return to work until April 15, 2003,

well after the expiration of his FMLA leave.[3]  Because the Department of Labor regulations interpreting the FMLA state that an employee has no right to reinstatement "[i]f the employee is unable to perform an essential function of the position because of . . . the continuation of a serious health condition," the courts concluded that Colburn's interference with substantive rights claim fails because Nichols was under no obligation to reinstate him.  29 C.F.R. § 825.214(b); see also 29 U.S.C. §§ 2612(a), (b), 2614(a).  That conclusion is plainly correct, and the substantive rights interference claim was properly dismissed.

## C.        Retaliation Claim

---

[3]    Colburn argues that he should not be held to this admission because his attorney erred in reporting the April 2003 date in his Rule 26(a)(1) original disclosure statement.  He points us to paragraphs in his summary judgment affidavit that "correct" this error.  The district court, invoking Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1 (1st Cir. 1994), had struck those affidavit paragraphs, among others, because they were inconsistent with his deposition testimony.

   Colburn argues that the affidavit should not have been stricken because it was not creating a "sham fact issue."  Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986).  But the applicable standard in this circuit is not whether a sham issue of fact has been created.  Our law is clear that "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory" without providing "a satisfactory explanation of why the testimony is changed."  Colantuoni, 44 F.3d at 4-5 (citing 10A Wright, Miller & Kane, Federal Practice and Procedure § 2726, at 30-31 (2d ed. Supp. 1994)).  The court properly considered that Colburn's lawyers had had ample opportunity to correct or clarify any alleged error in his deposition testimony.  Yet plaintiff's counsel made no effort to explain the inconsistency until January 3, 2005, after the magistrate judge handed down his recommended decision.  This is exactly the kind of gamesmanship that Colantuoni sought to address.

1.      Rejection of Defendant's Theory of Analysis

Before the district court, the defendant argued that if an FMLA plaintiff cannot return to work prior to the exhaustion of his FMLA leave, then ipso facto his retaliation claim fails.[4]  It propounds the same theory on appeal.  Defendant's theory mischaracterizes the law, and we reject it.

Defendant grounds its argument in the text of two regulations, 29 C.F.R. §§ 825.214(b) and 825.216(d).  Neither supports its theory.  The first provision deals with an employee's rights on returning to work from FMLA leave; it sets a limit on the right to reinstatement set out in 29 U.S.C. § 2614(a)(1).  As such, it circumscribes only Colburn's ability to bring an interference claim.  The second provision deals only with an employee who has taken workers' compensation leave concurrently with FMLA leave.  Nothing in the record shows that Colburn was on workers' compensation leave at any point during October 2001 to April 2003, and thus the provision is irrelevant to Colburn's claim.

Our law is clear that an FMLA plaintiff may pursue a retaliation claim even if there is no claim of violation of

_____

[4]      It appears that this argument influenced the district court, which concluded that Colburn's "inability to return to work following the expiration of his FMLA leave extinguishes his retaliation claim under the FMLA."  To the magistrate judge's analysis, which relied on 29 C.F.R. § 825.214(b), the district court added that Colburn failed to show that the statute could provide him with a remedy even if he could prove that a violation occurred.

-16-

substantive rights to leave. See Hodgens, 144 F.3d at 159-60 (describing the independent causes of action under the substantive and proscriptive provisions of the FMLA); accord Hunt v. Rapides Healthcare Sys., LLC, 277 F.3d 757, 769 (5th Cir. 2001) ("The [FMLA] provides two distinct causes of action, to which courts apply different analyses."). Further, the failure of a substantive claim of denial of leave does not foreclose a retaliation claim. See Hunt, 277 F.3d at 768-69 (noting that a plaintiff "need not establish a violation of the substantive, prescriptive provisions of the FMLA to allege a violation of the proscriptive provisions").

Nichols also proposes that even if the failure of Colburn's substantive claim does not automatically extinguish his retaliation claim, then the latter still fails because Colburn incurred no damages. This theory is also wrong. That a plaintiff cannot make out a case for damages for a substantive rights infringement claim does not mean no cause of action for retaliation can be stated.

29 U.S.C. § 2617(a) sets out the remedies for violations of § 2615:

(1) Liability

Any employer who violates section 2615 of this title shall be liable to any eligible employee affected --

(A) for damages equal to --

(i) the amount of --

(I) any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or

(II) in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks of wages or salary for the employee;

(ii) the interest on the amount described in clause (i) calculated at the prevailing rate; and

(iii) an additional amount as liquidated damages equal to the sum of the amount described in clause (i) and the interest described in clause (ii), except that if an employer who has violated section 2615 of this title proves to the satisfaction of the court that the act or omission which violated section 2615 of this title was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615 of this title, such court may, in the discretion of the court, reduce the amount of the liability to the amount and interest determined under clauses (i) and (ii), respectively; and

> (B) for such equitable relief as may be appropriate, including employment, reinstatement, and promotion.
>
> . . . .
>
> (3) Fees and costs
>
> The court in such an action shall, in addition to any judgment awarded to the plaintiff, allow a reasonable attorney's fee, reasonable expert witness fees, and other costs of the action to be paid by the defendant.

As to his claim of interference with his substantive rights under the FMLA, Colburn was not entitled to any remedy because he admitted he could not return to work at the expiration of the leave. But that did not mean there was no actionable harm under a retaliation theory. In some situations, a successful retaliation claim will lead to independent damages.

Colburn's termination occurred on January 31, 2002. He admitted that he would not have been able to return to work until after his period of leave expired, and he thus would not have been entitled to reinstatement under 29 U.S.C. § 2614. Accordingly, with regard to his retaliation claim, he would not have been entitled to any compensation or benefits after the date he exhausted his FMLA leave. In theory, he nonetheless could have had a loss of salary in the period between the date of the alleged wrongful termination and the date his leave expired. Yet, because his leave was an unpaid leave, he had no lost income. Also theoretically, Colburn could have suffered damages in the form of

-19-

lost value of employment benefits (say, health and dental insurance) in the period between his termination and the expiration of the unpaid leave. See 29 U.S.C. § 2611(5) (defining "employment benefits"). But he proffered no evidence showing that the alleged retaliatory firing resulted in such losses.[5]

Damages, however, are not the only remedy available under the FMLA. The FMLA also provides for equitable relief, including reinstatement, see id. § 2617(a)(1)(B); thus, a hypothetical plaintiff who proved retaliation could be reinstated once he or she is able to perform all essential functions of the position, see 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement . . . than if the employee had been continuously employed during the FMLA leave period."), even if he or she had no monetary damages. Indeed, counsel for Colburn made this very argument.

Further, the statute provides, in addition to any judgment awarded to the plaintiff, for "reasonable attorney's fee, reasonable expert witness fees, and other costs of the action to be paid by the defendant." 29 U.S.C. § 2617(a)(3). Thus, had Colburn proven his claim of retaliation and established entitlement to some

---

[5] Other circuits have held that nominal and consequential damages (including emotional distress damages) are not available under the FMLA. See Walker v. United Parcel Serv., Inc., 240 F.3d 1268, 1277-78 (10th Cir. 2001); Nero v. Industrial Molding Corp., 167 F.3d 921, 930 (5th Cir. 1999).

-20-

form of equitable relief, he could have been awarded attorney's fees and costs.

The fact that Colburn could not have returned to work before the expiration of his leave and thus cannot make out a claim for interference with his substantive rights does not necessarily preclude a retaliation claim.[6]

2. Proper Analysis of the Retaliation Claim

The crux of Colburn's complaint is that Nichols terminated him not because of any inappropriate behavior on his part, but in retaliation for his having taken protected medical leave. Colburn thus must show a causal link between his termination and retaliatory animus on the part of the employer.

In a retaliation case, there are varying approaches to showing intent. Our circuit has long held that where, as here, a

_____

[6]     Defendant argues that Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81 (2002), precludes any relief for the plaintiff in this case, even if he were to have proven retaliation. It cites to the following passage from Ragsdale:

> To prevail under the cause of action set out in § 2617, an employee must prove, as a threshold matter, that the employer violated § 2615 by interfering with, restraining, or denying his or her exercise of FMLA rights. Even then, § 2617 provides no relief unless the employee has been prejudiced by the violation.

Id. at 89. This passage does not support defendant's theory. A hypothetical plaintiff who succeeds in establishing a retaliatory firing claim would no doubt have been "prejudiced by the violation" and would thus be theoretically entitled to the full array of remedies provided by the statute.

plaintiff did not show direct evidence of retaliation,[7] he or she could use the inferential model of showing intent under a modified version of the framework established in <u>McDonnell Douglas Corp.</u> v. <u>Green</u>, 411 U.S. 792 (1973).[8]  <u>See</u> <u>Hodgens</u>, 144 F.3d at 160.  With perhaps the exception of the Ninth Circuit,[9] all other circuits

---

[7]    Colburn asserts in his brief that he has introduced both direct and indirect evidence of retaliation.  The only direct evidence he specifically points to is the hostile tone a human resources administrator allegedly used in one conversation two months before Colburn was discharged.

[8]    Colburn makes a perfunctory reference to a mixed-motive claim in his brief.  Whether a mixed-motive analysis is available at all in an FMLA case for retaliation is an open question, and we do not resolve it here.  The issue has been adverted to but avoided by three circuits.  See Bell v. Kaiser Foundation Hospitals, 122 F.App'x 880, 882 (9th Cir. 2004) (unpublished decision); Gibson v. City of Louisville, 336 F.3d 511, 514 (6th Cir. 2003); Trujillo-Cummings v. Pub. Serv. Co., No. 97-2337, 1999 WL 169336, at *5 (10th Cir. Mar. 29, 1999) (unpublished decision).  Since Colburn mentions a mixed-motive claim only in passing, we discuss this issue no further.

[9]    <u>See</u> <u>Bachelder</u>, 259 F.3d at 1124-25 & nn.10-11. <u>Bachelder</u>, as it says itself, was not a retaliation claim.  <u>See</u> <u>id.</u> at 1124.    There, the employer admitted that it terminated plaintiff's employment because of her absences from work.  The question was whether those absences were covered by the FMLA.  If they were, then the employer's decision to fire her constituted an impermissible interference with plaintiff's FMLA rights, whether the employer intended to interfere or not.  <u>See</u> <u>id.</u> at 1125-26. That is a vastly different situation from the one here.
    <u>Bachelder</u> specifically reserved the question whether it would apply <u>McDonnell Douglas</u> to a retaliation claim under 29 U.S.C. §§ 2615(a)(2) and (b).  <u>Id.</u> at 1125 n.11.  And it did not expressly rule on whether it would apply the framework to the type of retaliation claim we have here, which alleges that the employer retaliated against the employee's taking of FMLA leave (rather than against, say, the employee's participation in legal proceedings). <u>See</u> <u>id.</u> at 1124 n.10 (implying that it would apply <u>McDonnell Douglas</u>, if at all, only to cases arising under §§ 2615(a)(2) and (b)).  In a later unpublished decision, the Ninth Circuit seems to have construed <u>Bachelder</u> to preclude the application of <u>McDonnell</u>

-22-

have decided to use the same framework.  See, e.g., Potenza v. City of New York, 365 F.3d 165, 167-68 (2d Cir. 2004); Lepore v. Lanvision Sys., Inc., 113 F.App'x 449, 453 (3d Cir. 2004) (unpublished decision); Nichols v. Ashland Hosp. Corp., 251 F.3d 496, 502 (4th Cir. 2001); Chaffin v. John H. Carter Co., Inc., 179 F.3d 316, 319 (5th Cir. 1999); Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 315 (6th Cir. 2001); King, 166 F.3d at 891-92; Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832 (8th Cir. 2002); Morgan v. Hilti, Inc., 108 F.3d 1319, 1323, 1325 (10th Cir. 1997); Strickland v. Water Works & Sewer Bd., 239 F.3d 1199, 1206-07 (11th Cir. 2001); Gleklen v. Democratic Cong. Campaign Comm., Inc., 199 F.3d 1365, 1367-68 (D.C. Cir. 2000).

As Hodgens states:

> Under that framework, a plaintiff employee must carry the initial burden of coming forward with sufficient evidence to establish a prima facie case of . . . retaliation.  If he does so, then the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's [termination]," sufficient to raise a genuine issue of fact as to whether it discriminated against the employee. . . . If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating him was in fact a pretext for retaliating against him for having taken protected FMLA leave.

---

Douglas to the type of claim we have here.  See Zsenyuk v. City of Carson, 99 F.App'x 794, 796 (9th Cir. 2004) (unpublished decision).

-23-

144 F.3d at 160-61 (alteration in original) (citations omitted) (quoting McDonnell Douglas, 411 U.S. at 802).

Although we are doubtful Colburn even makes out a prima facie case,[10] we turn to the issue of pretext. Nichols says that it fired Colburn because of its belief that he had falsified his reasons for being absent from work and that falsehood was proven on two specific occasions -- namely, January 28 and 29, 2002. On those two days, the investigator videotaped Colburn -- who had reported that he was unable to perform his duties at work because of his migraines -- engaging in a number of activities outside of his home, including driving, spending thirty minutes at the gym, renting videos, and shopping. These activities, which occupied Colburn for two to three hours each day during the period of time he claimed to have been unable to work because of migraines, were inconsistent with the information he had given the employer about his migraines. That information was on his short-term disability application form, on which he stated that when he was experiencing a migraine, he could not perform "[a]ll activities . . . , including driving."[11]

---

[10] To make out a prima facie case, plaintiff must show (1) that he engaged in a protected action (here, requesting or taking FMLA leave); (2) that he suffered an adverse employment action (here, being fired); and (3) that there was some possibility of a causal connection between the employee's protected activity and the employer's adverse employment action, in that the two were not wholly unrelated. See Hodgens, 144 F.3d at 161.

[11] Indeed, even at his deposition, Colburn continued to maintain that the form he submitted was accurate. To counsel's

-24-

Colburn points to the following as evidence that Nichols's explanation was pretext: (1) Nichols took the "extraordinary step" of placing him under surveillance; (2) Nichols never consulted any medical professional about whether Colburn's activities on January 28 and 29 were consistent with those of someone suffering from a migraine; (3) Nichols departed from its progressive discipline policy in discharging him without warning; (4) Nichols's human resources administrator, Christine Fox, seemed hostile toward him; and (5) the temporal relationship between his taking leave and his termination.

The hiring of the investigator, alone or in combination, does not suffice to show that the employer's reasons for terminating Colburn were pretext. Nichols had hired private investigators at least five times in the past, and Colburn produced no evidence that similarly situated employees about whom the employer was suspicious were treated differently. See Allen Health Sys., 302 F.3d at 835 ("An employee can prove pretext by showing the employer meted out more lenient treatment to similarly situated employees . . . who did not engage in protected activity." (citing Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994))).

As to the employer's grounds for suspicion that led to the hiring of the investigator, Colburn does not produce any

---

question of whether it is "correct to state that when you were experiencing . . . a migraine you couldn't . . . perform any activities, including driving," Colburn answered, "Correct."

evidence disputing the employer's statement that it could not always reach him at home when he was out on leave. Also, he admits that he failed to provide the doctors' reports needed to support his application for short-term disability and leave. As for his claim that the employer should have taken it upon itself to secure the medical reports and research the effects of his migraines, the employer had no need to consult medical experts about the symptoms of migraines; it relied on the employee's own description that he could not do anything -- even drive -- during a migraine. Its choice to rely on Colburn's own words does not prove pretext -- it tends to show the opposite.

Moreover, there was no evidence to support Colburn's claim that the employer failed to follow its progressive discipline policy. That policy provides for immediate termination on account of serious misconduct -- a category that Nichols reasonably determined encompassed Colburn's going to the gym and driving around doing errands while purportedly too sick to work. Its decision to discharge him was within the bounds of its disciplinary policy and raises no inference of pretext. See id.

Nor does a single administrator's "tone" show pretext. Colburn made no showing that Christine Fox had anything to do with the decision to terminate his employment. Even assuming, dubitante, that Fox's conduct could be imputed to the employer and that she was, in fact, hostile, the conversation in question took

-26-

place in December 2001, after persistent but futile efforts on the part of the human resources department to secure from Colburn the medical information it needed to confirm and process his disability application; given the context, any testiness or frustration on the part of the administrator is not evidence of pretext.

Colburn also argues that pretext can be inferred by the fact that Nichols terminated him within days of his taking medical leave. While "protected conduct closely followed by adverse action may justify an inference of retaliatory motive," see Hodgens, 144 F.3d at 168 (quoting Marx v. Schnuck Markets, Inc., 76 F.3d 324, 329 (10th Cir. 1996)), Colburn began to take leave in October 2001 and was not terminated until almost four months later, after he had taken more than twenty-five days of leave. This chronology raises no inference of retaliatory motive.

Throughout, Colburn has failed to produce evidence of the sort commonly used to show pretext. There is no statement by any decisionmaker evidencing retaliatory motive. See Hodgens, 144 F.3d at 168-69. And there is no evidence that comparably situated employees, caught out in a lie, were not fired. See Allen Health Sys., 302 F.3d at 835.

This leaves one other argument by Colburn, which is about the evidence pertinent to this issue. At his deposition, he testified that he could not engage in any activity, including driving, when he had a migraine and that his disability application

-27-

was correct when it said the same thing. In certain sections of his summary judgment affidavit, however, he claimed that he, in fact, could engage in minimal activities, such as driving and shopping, during the onset and aftermath of his migraines, which were distinct phases separate from the most painful acute phase. The district court struck the sections of the affidavit that referred to symptoms experienced at the onset of a migraine for being inconsistent with Colburn's deposition testimony. The district court was well within its discretion to do so under Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1 (1st Cir. 1994).

Colburn's argument on appeal that his change of testimony was permissible also misses the point. He had told his employer that he could not drive or engage in any activity while he had a migraine. Whether he actually can drive during the onset or aftermath of a migraine is irrelevant. Based on the information he gave the employer, the employer's conclusion that he falsified his reasons for being out is hardly pretextual.

On this record, we find insufficient evidence for any factfinder to connect Nichols's termination of Colburn with any retaliatory animus on the part of the employer.

**IV.**

Summary judgment for defendant is **affirmed**. Costs are awarded to defendant.

-28-