# United States Court of Appeals
## For the First Circuit

No. 04-2391

KEVIN W. TOBIN,

Plaintiff, Appellant,

v.

LIBERTY MUTUAL INSURANCE COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Torruella, Lipez, and Howard,
Circuit Judges.

Frank J. Frisoli, with whom Frisoli & Frisoli, was on brief, for appellant.
Alan D. Rose, with whom Richard E. Bowman and Rose & Associates, were on brief, for appellee.

December 23, 2005

**TORRUELLA**, **Circuit Judge**. Plaintiff-appellant Kevin W. Tobin appeals the award of summary judgment to his former employer, Liberty Mutual Insurance Company ("Liberty Mutual"), on his state and federal claims of disability discrimination and failure to accommodate, pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq. (2000), and the Massachusetts anti-discrimination statute, Mass. Gen. Laws ch. 151B ("Chapter 151B"). Because we believe that summary judgment was improperly granted on Tobin's "failure to accommodate" claim, we vacate the district court's judgment on that claim. We affirm, however, the remainder of the district court's decision.

## I.

Tobin was hired by Liberty Mutual on September 17, 1964 for an administrative position. In May 1968, he was promoted to sales representative, a position he held until his termination in January 2001. As a sales representative, Tobin was responsible for selling insurance, including automobile, home, and life insurance. He was also expected to assist in customer service and retain business.

Since 1976, Tobin has been under the regular care of a psychiatrist, mainly for treatment of bipolar disorder. This condition limited Tobin's focus and concentration, impaired his ability to prioritize and complete tasks, required that he have more time to finish his work, and affected his organizational

-2-

skills.  It was only in December 1997, however, that Tobin revealed his condition to officials at the company.

## A.  Tobin's Performance

Although Tobin had accumulated a large book of business over the years and the annual premiums generated from this book of business earned "significant profits," Tobin's yearly new business sales were considered deficient beginning in 1992.  For example, for the twelve-month period ending September 1993, Tobin had sold only 270 new policies -- a significant shortfall given that the quota for new policy sales was set at 339.  In his Sales Representative Appraisal for that year, on a scale from 1-6, with 1 being the highest, Tobin received a 6 in the "Sales Rating" category.  His overall evaluation was a 5.  In 1994-1996 and 1998, Tobin's appraisals reflect similar negative ratings and comments for sales, prospecting, performance, and overall performance, and positive ratings and comments for quality, loss ratio, and retention.[1]

In April 1996, Tobin's supervisor, Mike Robin, gave Tobin a written warning stating that failure to meet the sales requirements for a thirty-day period would lead to a sixty-day probation followed by possible termination.  Although Tobin did not meet the requirements for the thirty-day period, Liberty Mutual waived the probation because Tobin's wife was ill.  On November 21,

---

[1]  No appraisal was produced for 1997.

1997, Robin placed Tobin on a nine-week warning period, emphasizing that new business sales were critical, as were participation in sales initiatives and refraining from "inappropriate and insubordinate behavior in the office," including the use of profane language. Robin made clear that Tobin would face probation unless he brought his performance up to an acceptable level by demonstrating increased sales results and participating in sales initiatives.

Tobin then took two short-term disability leaves of absence. The first lasted from December 1997 until June 1998, and the second from September 1998 until January 1999. In both instances, Tobin's doctor, Dr. William Kantar, indicated that he had diagnosed Tobin as bipolar and that Tobin was significantly restricted as to interpersonal relations, as well as to occupational and social activities. Each time Tobin returned to work, Tobin's new supervisor, Manina Schwitters, gave Tobin a reduced work schedule for his first four weeks after he returned from leave. Each time, upon resumption of his full-time duties, Tobin's warning period was reinstated.

When Tobin returned to work the second time, in January 1999, Liberty Mutual hired a nurse, Cathy Harding, to assist him in resuming his position as a sales representative. After working reduced hours for four weeks, Tobin resumed his full-time duties on February 1, 1999. Tobin's supervisor extended the two weeks

remaining from the November 1997 warning period to run for four weeks, from February 1 to February 26. Tobin failed to sell twenty-four new policies during the four-week warning period to avoid beginning a four-week probation period. However, during a meeting with several supervisors, Tobin produced several additional policies, which were accepted in order to meet the quota set for the warning period.

In a letter dated March 8, 1999, Schwitters indicated that she would monitor Tobin's sales results in four-week increments for the rest of the year beginning on March 1. At the end of the first increment, Schwitters notified Tobin he was being placed on probation for failing to meet the minimum sales requirements. The quota for the period had been twenty-four, and Tobin sold only ten. Tobin then successfully completed the five-week probationary period by selling the required thirty policies. Tobin's sales performance, however, deteriorated over the next several months, and he was again placed on probation on November 27, 2000. Tobin failed to sell the required thirty policies during this second probationary period and was terminated on January 10, 2001.

## B. Mass Marketing Accounts

Mass Marketing accounts ("MM accounts") are group insurance discount programs offered to businesses and associations throughout the United States. The employees or association members

who purchase insurance policies through MM accounts receive benefits such as discounted policy premiums, automatic deduction of premium payments from paychecks, and a waiver of finance and service charges. MM accounts provide sales representatives with access to employees of participating employers in workplace settings and thereby afford sales representatives exposure to a large volume of potential clients. These MM accounts are desirable to the sales representatives because they provide a good source for potential sales.

Tobin says he repeatedly requested to be assigned MM accounts and to be provided with adequate sales support. He maintains that Liberty Mutual's failure to assign him MM accounts was both a denial of a reasonable accommodation and discriminatory pursuant to state and federal law. Tobin argues that but for the failure of Liberty Mutual to assign him MM accounts and to provide adequate sales support, he would have been able to meet the sales quotas set for him.

The parties dispute whether assigning Tobin a MM account would have violated Liberty Mutual's policy for assigning such accounts. Liberty Mutual contends that the MM accounts were distributed on the basis of merit -- given to those sales representatives who most actively took initiative to land new MM accounts -- as well as according to workload. Tobin, however, contends that on at least one occasion Schwitters violated this

-6-

policy by assigning an MM account to Herb Schneiderman, a sales representative with a substandard sales performance, and that Tobin could have likewise been assigned such accounts despite his below-quota sales. Liberty Mutual responds that Schwitter's assignments were not inconsistent because, unlike Tobin, Schneiderman at least took some initiative to open new MM accounts. Liberty Mutual further argues that, in any event, there is no evidence that Tobin would have been able to handle adequately such an account were it assigned to him or that he would have been able to meet the quotas, even with MM accounts.

Tobin now appeals the district court's grant of summary judgment for Liberty Mutual, arguing that the district court erred because (1) Liberty Mutual's explanation for Tobin's termination was pretextual, (2) there was a nexus between his disability and the requested accommodation of assignment of MM accounts, and (3) Liberty Mutual failed to engage in an "interactive process" to help accommodate Tobin's disability.

## II.

We review the district court's grant of summary judgment de novo, see, e.g., Guzmán-Rosario v. United Parcel Service, Inc., 397 F.3d 6, 9 (1st Cir. 2005), and construe the record in the light most favorable to Tobin. See United Parcel Service, Inc. v. Flores-Galarza, 318 F.3d 323, 330 (1st Cir. 2003). Summary judgment is appropriate where there is no genuine issue of material

-7-

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

## A.  Disability Discrimination Claim

In evaluating Tobin's disability discrimination claim under the ADA and Chapter 151B, we use the burden-shifting framework outlined by the Supreme Court in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973).[2]  See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999) (approving use of McDonnell-Douglas framework in connection with ADA claims of disability discrimination).  Under this approach, Tobin must first establish a prima facie case by establishing that (1) he suffers from a disability or handicap, as defined by the ADA and Chapter 151B, that (2) he was nevertheless able to perform the essential functions of his job, either with or without reasonable accommodation, and that (3) Liberty Mutual took an adverse employment action against him because of, in whole or in part, his

---

[2]  The district court noted that "state and federal disability law are in accord, at least for present purposes."  Tobin v. Liberty Mutual Ins. Co., No. Civ.A.01-11979-DPW, 2004 WL 1922133 at *6 n.9 (D. Mass. Aug. 30, 2004).  We note, however, that the standards under the ADA and Chapter 151B occasionally differ in ways that are relevant to this case.  See, e.g., Dahill v. Police Dep't of Boston, 748 N.E.2d 956 (Mass. 2001) (rejecting, for the purposes of Chapter 151B, the federal rule that mitigating or corrective devices must be considered in determining whether an individual is disabled).  Here, we do not emphasize these differences, as the parties before the district court already stipulated that "state and federal disability law are in accord" for the purposes of this case.  For this reason, throughout the remainder of this opinion, we frame our discussion primarily in terms of the ADA and federal case law, as the district court did.

protected disability.  See McDonnell-Douglas, 411 U.S. at 802; Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002); Benoit v. Technical Mfg. Corp., 331 F.3d 166, 175 (1st Cir. 2003).  If Tobin is able to do this, the burden then shifts to Liberty Mutual to articulate a legitimate, non-discriminatory reason for its employment decision and to produce credible evidence to show that the reason advanced was the real reason.  McDonnell-Douglas, 411 U.S. at 802.  Finally, if Liberty Mutual offers such a reason, the burden shifts back to Tobin, and he must proffer evidence to establish that Liberty Mutual's non-discriminatory justification is mere pretext, cloaking discriminatory animus.  Id. at 804.  The ultimate burden of proving unlawful discrimination rests at all times with Tobin.  Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 143 (2000).[3]

---

[3]  An alternative framework involves "mixed-motive" analysis, as established by the Supreme Court in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).  Mixed-motive analysis is appropriate where evidence exists that an employer considered both a proscribed factor (for example, race or disability) and one or more legitimate factors (for example, competence) in making an adverse employment decision.  Price Waterhouse, 490 U.S. at 241-242; Fernándes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 580 (1st Cir. 1999).  We believe that in this instance "mixed-motive" analysis is inapplicable.  This is because Tobin raises the issue of the use of "mixed-motive" analysis for the first time on appeal.  Contrary to Tobin's claim that he made "implicit reference" to a mixed-motive argument in the district court, Tobin never argued below that his claims should be analyzed under a mixed-motive framework.  As the district court stated, "neither party here disputes that the pretext model [as opposed to a mixed-motive model] is the proper mode of analysis for this case."  Tobin, 2004 WL 1922133 at *6 n.10.  Theories not raised in the district court cannot be raised for the first time on appeal.  See Rocafort v. IBM Corp., 334 F.3d 115, 121 (1st Cir. 2003) (stating that "'a litigant's failure to

Here, it is undisputed that Tobin has established a prima facie case and that Liberty Mutual has advanced a legitimate, non-discriminatory reason for its employment decision. The issue in dispute here is whether Liberty Mutual's asserted reason was pretextual -- i.e., that the reason was advanced merely to disguise Liberty Mutual's real reason for terminating Tobin's employment, his disability. "In assessing pretext, the court must look at the total package of proof offered by the plaintiff." Benoit, 331 F.3d at 174.

Tobin argues that Liberty Mutual's proffered reason is indeed a pretext and that he was fired because of his disability. Tobin, however, has to clear two significant hurdles before he is able to show pretext. First, he must refute the clear evidence put forward by Liberty Mutual showing that it was poor insurance sales, and not disability, that constituted the real reason for Tobin's termination. Second, he must advance evidence of his own showing that Liberty Mutual's asserted reason was a pretext hiding discrimination. See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991) (stating that "[i]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must elucidate specific facts which would enable a jury to find

---

explicitly raise an issue before the district court forecloses that party from raising the issue for the first time on appeal'") (quoting Boston Beer Co. Ltd. P'ship v. Sleser Bros. Brewing Co., Inc., 9 F.3d 175, 180 (1st Cir. 1993); United States v. Slade, 980 F.2d 27, 30 (1st Cir. 1992)).

that the reason given is not only a sham, but a sham intended to cover up the employer's real motive" (internal quotations omitted)).

Tobin, however, fails to clear either of these hurdles. With regard to the evidence produced by Liberty Mutual, the company provided a full and well-documented account of Tobin's "longstanding performance deficiencies." As Liberty Mutual recounts, Tobin failed to meet minimum quotas and standards; he did not show up for meetings with supervisors; and his performance reviews were poor. Tobin has done nothing to show that this cited evidence is false.

Moreover, Tobin has produced no evidence of his own to prove that Liberty Mutual's asserted reason was merely a pretext to disguise discrimination. Although he does cite to several company documents -- e-mails and a list enumerating the measures the company took in order to assist Tobin -- in an attempt to show discriminatory action on the part of the company, these documents pre-date Tobin's December 1997 disclosure of his disability to company officials. At the time of the drafting of these documents, in September and October 1997, people at the company did not even know that Tobin suffered from any sort of disability. As such, these documents cannot serve to show any malice or discriminatory animus by Liberty Mutual.

Similarly, Tobin attempts to show that Liberty Mutual's asserted reason was mere pretext by pointing to the fact that several employees who were "similarly situated" to him were given MM accounts -- an opportunity that was withheld from him. Tobin, however, fails to provide specific evidence showing that these other employees were indeed similarly situated to him. See Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996) (stating that a "claim of disparate treatment based on comparative evidence must rest on proof that the proposed analogue is similarly situated in material respects"). In fact, there is significant evidence in the record to show that Tobin and these employees were not similarly situated. For example, one of the employees, Herb Schneiderman, had improved his performance over time at the company and was noted for his "good improvement in his outlook and attitude." Tobin, in comparison, was constantly criticized for his performance, his organization, and for his inability to follow the directions of his managers. As we cannot conclude that there was any evidence here that Tobin was a victim of disparate treatment, we cannot find any evidence in the record to support Tobin's claim that Liberty Mutual's decision to terminate his employment was not based on the company's proferred grounds. For these reasons, we hold that the district court was correct in granting summary judgment on Tobin's disability discrimination claim.

## B. Failure to Accommodate Claim

Tobin's second claim arises under both the ADA and Chapter 151B. Under the ADA, employers are required to provide reasonable accommodation to an otherwise qualified applicant or employee with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on the employer's business. 42 U.S.C. § 12112(b)(5)(A) (2000).[4] Here, Tobin sought two accommodations in particular from Liberty Mutual: (1) assignment of MM accounts; and (2) additional service representative assistance. The district court granted summary judgment in favor of Liberty Mutual on this claim.

Looking primarily to Tobin's request for MM accounts, we think that this grant of summary judgment was improper. To survive summary judgment on his "reasonable accommodation" claim, Tobin had to produce enough evidence for a reasonable jury to find that (1) he was disabled within the meaning of the ADA, (2) he was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) Liberty Mutual, despite knowing

---

[4] Section 102(a) of the ADA states: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . terms, conditions, and privileges of employment . . . ." 42 U.S.C. § 12112(a) (2000). Discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A) (2000).

of his disability, did not reasonably accommodate it.  Estades-
Negroni v. Associates Corp. of North America, 377 F.3d 58, 63 (1st
Cir. 2004) (internal quotation marks and citation omitted).

Tobin presented sufficient evidence on the first and
third prongs to survive summary judgment.  See Tobin, 2004 WL
1922133 at *4, 10 (noting that "[t]o be sure, Tobin's disability is
grounds for accommodation under the ADA" and that Tobin had
requested but was refused an MM account as an accommodation for his
disability).  It was the second prong of the test that the district
court based summary judgment on -- and a conclusion that allowing
Tobin access to MM accounts would have altered his job requirements
and hence the essential functions of his employment.  The district
court wrote:

> I find that summary judgment is warranted
> because the assignment of mass marketing
> accounts is not tied to Tobin's disability
> . . . Tobin has introduced no evidence as to
> how the assignment of mass marketing accounts
> would have addressed the particular
> deficiencies created by his particular
> disability . . . [M]ore mass marketing
> accounts would likely have led to increased
> sales for any sales representative, whether
> disabled or not . . . Assignment of mass
> marketing accounts would, therefore, have been
> functionally equivalent to altering job
> performance requirements and quotas, which the
> ADA does not require of employers.

Tobin, 2004 WL 1922133 at *10.[5]

---

[5]  In Calef v. Gillette Co., 322 F.3d 75 (1st Cir. 2003), we wrote
that "[a]n employer has no duty to modify an essential function of
a job.  If the plaintiff . . . cannot perform an essential function

-14-

Immediately prior to this excerpted passage, however, the district court had concluded -- and we agree -- that there was a triable issue of fact as to whether access to MM accounts would have altered the nature of Tobin's job requirements and the essential functions of his employment. See Tobin, 2004 WL 1922133 at *9 ("The evidence indicates that Schwitters used a number of subjective factors in assigning mass marketing accounts that had nothing to do with 'prospecting.' . . . Liberty Mutual has made no showing that assigning Tobin a mass marketing account . . . would have created an 'undue hardship.'").

We have noted that many of our cases on essential function and reasonable accommodation have "turned on the surprising failure of one party or the other to proffer any significant evidence in favor of their position." Reed v. LePage Bakeries, 244 F.3d 254, 260 (1st Cir. 2001). That is exactly the situation here. Despite its burden to come forward with some evidence on the essential function issue, see Ward v. Massachusetts Health Research Inst., Inc., 209 F.3d 29, 35 (2000), Liberty Mutual has failed to point to any evidence in the record that awarding Tobin an MM account would change the essential function of his job.

Liberty Mutual asserts on appeal, as it did before the district court, that accommodating Tobin with an MM account would have forced the company "to ignore its own performance standards."

---

of the job, then he is not a qualified individual [under the ADA] and there is no duty to accommodate." Id. at 86 n.8.

However, as the district court concluded, there was a disputed issue of fact as to how MM accounts were assigned. Tobin pointed to evidence demonstrating that supervisors at the company had used a number of subjective factors in assigning MM accounts.[6] Tobin also offered evidence that he was the only sales representative in the office who was expected to meet his sales quotas by prospecting for sales outside of MM accounts. Given the outstanding material issue of fact as to how MM accounts were assigned, and, ultimately, as to the nature of Tobin's essential job requirements, we simply do not see how the district court could have concluded on a summary judgment standard that accommodating Tobin with an MM account would have altered those job requirements.

We do not suggest that Liberty Mutual was required to accommodate Tobin in a way that would have altered his job functions. See Calef, 322 F.3d at 86 n.8. If this case goes to trial, Liberty Mutual can attempt to prove that Tobin's failure to make sales outside of MM accounts constituted a failure to fulfil an essential function of the job. If the company does so, it will prevail after all. Similarly, Liberty Mutual can attempt to prove that Tobin could not have done his job even if he were given access

---

[6] That Schneiderman was given an MM account even though he was deficient in sales performance did not constitute evidence that Tobin was a victim of pretext, because Tobin failed to refute Liberty Mutual's evidence that the company's motives for Schneiderman's treatment were non-discriminatory. On the other hand, Schneiderman's treatment does undermine Liberty Mutual's assertion that MM accounts were assigned according to sales performance.

-16-

to an MM account, or that Tobin was not actually disabled under the ADA. But the evidence in Tobin's favor prevents us from granting summary judgment on any of these grounds. We therefore vacate the district court's grant of summary judgment on this claim and remand the issue to the district court for further proceedings.

## C.  Failure to Engage in Interactive Process Claim[7]

Tobin's final claim is that Liberty Mutual failed to engage in an "interactive process" with him to identify other appropriate accommodations. The ADA's regulations state that "it may be necessary for the covered entity [the employer] to initiate an informal, interactive process with the qualified individual [the employee] with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3) (2005).[8] Thus, once the employer becomes aware of the disability of an employee, he is expected to engage in a meaningful dialogue with the employee to find the best means of accommodating that disability. The district court determined that

---

[7]  We recognize that Tobin's "interactive process" claim is a subsidiary theory of his "reasonable accommodation" argument. Interactive process, after all, is the first step in a proper response to a disabled employee's request for reasonable accommodation. It is a means of ensuring that employers take steps to understand and address their employees' disabilities. Nevertheless, we treat Tobin's "interactive process" claim here separately because the parties briefed the issue separately and because we believe that it is possible for an employer to satisfy its duty to engage in "interactive process" yet still fail to provide "reasonable accommodation" to a disabled employee.

[8]  State law imposes a similar requirement to engage in an "interactive process." See Russell v. Cooley Dickinson Hosp., Inc., 772 N.E.2d 1054, 1065 (Mass. 2002).

Tobin did not produce sufficient evidence to support his claim that Liberty Mutual failed to engage in an "interactive process" with him.

In Calero-Cerezo v. Dep't of Justice, we noted that "[t]he scope of the employer's obligation in this [interactive] process is not crystal clear." 355 F.3d 6, 23-24 (1st Cir. 2004). Although an "employee's request for reasonable accommodation requires a great deal of communication between the employee and employer," Criado v. IBM Corp., 145 F.3d 437, 444 (1st Cir. 1998) (internal quotation marks and citation omitted) -- something especially true in cases such as this one, involving an employee suffering from mental illness, see id. -- this does not mean that the employer has the unreasonable burden of raising and discussing every conceivable accommodation with the disabled employee. As the ADA regulations themselves state, the "interactive process" is to be "informal" and a means of uncovering "potential reasonable accommodations" that could overcome the employee's disability. 29 C.F.R. § 1630.2(o)(3) (2005) (emphasis added).

The facts of this case illustrate well the need to emphasize the employer's limited and carefully-defined role. This is not an instance where the employer Liberty Mutual simply rejected any request for accommodation without further discussion. See García-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 648 n.13 (1st Cir. 2000); see also Jacques v. Clean-Up Group, Inc., 96

F.3d 506, 515 (1st Cir. 1996) ("There may well be situations in which the employer's failure to engage in an informal interactive process would constitute a failure to provide reasonable accommodation that amounts to a violation of the ADA."). Here, there was not only a great deal of discussion about Tobin's difficulties, but significant action on the part of company officials. Liberty Mutual provided Tobin with multiple accommodations. The district court noted that "[t]he record is filled with evidence of accommodations Liberty Mutual made for Tobin, including the provision of a nurse, computer trainings, and numerous meetings to help Tobin create the skills and plans to increase his sales effectiveness." Tobin, 2004 WL 1922133 at *11. It is hard to imagine that all these measures were simply "inflicted upon" Tobin without any input on his part. We believe that Liberty Mutual followed the ADA regulations and that the steps taken by the company were sufficient to satisfy its obligation to engage in an "interactive process." We therefore affirm the district court's holding on Tobin's "interactive process" claim.

## III.

For the reasons set forth above, we vacate the order of the district court regarding Tobin's "failure to accommodate" claim and remand that issue for further proceedings consistent with this opinion. The judgment of the district court is affirmed as to

Tobin's "disability discrimination" and "interactive process" claims.

**<u>Affirmed in part, and vacated and remanded in part</u>**. Each party to bear its own costs on appeal.

**"Concurrence follows."**

**HOWARD**, <u>Circuit Judge, concurring in part and concurring in the judgment</u>.  I agree with the lead opinion's resolution of Tobin's discrimination and "interactive process" claims.  I also agree with the result reached on the reasonable accommodation claim.  I write separately, however, to address what I perceive to be the district court's reason for granting Liberty Mutual (Liberty) summary judgment on the reasonable accommodation claim.

The lead opinion rejects the district court's reasonable accommodation ruling because there were disputed facts about the method by which Liberty assigned employees to mass marketing accounts.  <u>Ante</u> at 15.  Liberty presented evidence that such assignments were merit based, while Tobin presented evidence that Liberty used non-merit based factors to make these assignments.  See <u>id.</u>  This disputed fact relates to Liberty's claim that it was not required to alter its assigning criteria as a reasonable accommodation under the Americans with Disabilities Act (ADA).  But, as I read the district court opinion, this is not the ground on which summary judgment was granted.  <u>Tobin</u> v. <u>Liberty Mut. Ins. Co.</u>, No. Civ. A-01-11979-DPW, 2004 WL 1922133, at *9 (D. Mass. Aug. 30, 2004) (rejecting Liberty's summary judgment argument that it was not required to change its criteria for assigning mass marketing accounts because it used merit-based criteria).

The district court rejected Tobin's reasonable accommodation claim on the basis that assigning him to a mass

-21-

marketing account would not have addressed the symptoms of his bipolar condition (i.e, inability to organize). As the district court explained:

> Tobin has introduced no evidence as to how the assignment of mass marketing accounts would have addressed the particular deficiencies created by his particular disability. Indeed . . . more mass marketing accounts would likely have led to increased sales for any sales representative whether disabled or not. To be sure, Tobin's disability is grounds for accommodation under the ADA, it does not however, entitle him to any and every change in work conditions that would improve his performance. Rather, the accommodation must be for the disability, and Tobin has nowhere shown that assignment of mass marketing accounts were reasonable accommodations for his particular disability.

Tobin, 2004 WL 1922133, at *10. I am not persuaded that the lead opinion's reliance on disputed facts related to Liberty's criteria for selecting agents for mass marketing accounts is sufficiently responsive to this reasoning.

Nevertheless, I agree that the district court's ruling was erroneous. The legal principle grounding the holding seems sound. See Wood v. Crown Redi-Mix, Inc., 339 F.3d 682, 687 (8th Cir. 2003 ("Where the reasonable accommodation requested is unrelated to the limitation, we do not believe an ADA action may lie."). The ADA's purpose is to provide a disabled employee with a reasonable accommodation that will help the employee overcome the limitation caused by his or her particular disability; it is not a statute intended to provide benefits to an employee simply because

-22-

the employee happens to be disabled.  See Felix v. N.Y. City Transit Auth., 324 F.3d 102, 107 (2d Cir. 2003) ("The ADA mandates reasonable accommodation of people with disabilities in order to put them on an even playing field with the non-disabled; it does not authorize a preference for disabled people generally.").

Tobin has, however, generated sufficient record evidence to permit the conclusion that assigning him to a mass marketing account would have assisted him in overcoming the particular limitation caused by his bipolar disability.  Tobin's supervisor testified that Tobin's biggest problem "was identifying potential new customers and going to see them" but that "he [did] a good job at closing the sale."  There was also evidence that, because mass marketing accounts provide the assigned agent with a captive audience of potential clients, closing skills are more important than business generation skills for agents assigned to these accounts.  On this evidence, a reasonable jury could conclude that assigning Tobin to a mass marketing account would have assisted him in overcoming his disability-related problem of being insufficiently organized to identify and pursue new clients.  For this reason, Tobin's reasonable accommodation claim should proceed.