# United States Court of Appeals
## For the First Circuit

No. 06-1486

MICHELE R. FREADMAN,

Plaintiff, Appellant,

v.

METROPOLITAN PROPERTY AND CASUALTY INSURANCE COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Boudin, Chief Judge,
Torruella and Lynch, Circuit Judges.

Edward J. Juel, with whom Law Offices of Edward J. Juel was on
brief, for appellant.
Susan R. Oxford, Attorney, with whom James L. Lee, Deputy
General Counsel, and Carolyn L. Wheeler, Acting Associate General
Counsel, were on brief, for U.S. Equal Employment Opportunity
Commission, amicus curiae.
Steven E. Snow, with whom Michael J. Murray and Partridge Snow
& Hahn LLP were on brief, for appellee.

April 18, 2007

**LYNCH**, **Circuit Judge**.  Michele Freadman brought this action against her former employer, Metropolitan Property and Casualty Insurance Company ("Metropolitan"), alleging violations of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213, and Rhode Island state law.  Freadman claimed that Metropolitan (1) discriminated against her on the basis of a protected disability, (2) failed to reasonably accommodate her disability, and (3) retaliated against her for attempting to obtain a reasonable accommodation.

The district court granted summary judgment to Metropolitan, holding that Freadman failed to establish a prima facie case on her claims.  Freadman v. Metro. Prop. & Cas. Ins. Co., No. 01-628, 2006 WL 346455, at *2-4, 6-7 (D.R.I. Feb. 14, 2006).  Freadman now appeals the award of summary judgment.

We affirm summary judgment for Metropolitan on all of Freadman's claims.

I.

We review the district court's grant of summary judgment de novo, considering the facts and the reasonable inferences therefrom in the light most favorable to the nonmoving party. Guzmán-Rosario v. United Parcel Serv., Inc., 397 F.3d 6, 9 (1st Cir. 2005).

Metropolitan hired Freadman in 1993 and promoted her to manager in 1995.  In March 1999, Freadman became ill with

-2-

ulcerative colitis, and from March 1999 to July 1999, she took medical leave for treatment of this condition. At the time, Freadman reported to Assistant Vice President Robert Smith.

During her convalescence, Smith visited Freadman and phoned her on several occasions. During these conversations, Freadman and Smith discussed Freadman's need for "reasonable hours, [fewer] last minute time driven assignments, work/life balance, being able to exercise, [and] having adequate staff." Smith agreed to Freadman's request for a better work/life balance and to make changes; indeed, he told Freadman that she worked too hard.

Freadman returned to work in July 1999. She was accommodated by being allowed to work part-time for the first several weeks, even though such part-time work was not normally available for managers.

Upon her return, Smith reassigned Freadman's training, compliance, and performance enhancement duties to other employees in an attempt to reduce her workload, as she had requested. Smith also arranged for Freadman to take over a new project known as "Ease of Doing Business" (EDB), which was headed by Smith's boss, Chris Cawley. Although Smith did not request that she do so, Freadman began working long hours again, including nights and weekends. According to plaintiff, she needed to work such hours because of the high-pressure assignments she received. Smith in fact had previously told her on more than one occasion that "it

would be okay [for her] to do a B job instead of an A job." Freadman discounted that statement and did not discuss the matter with him further.

Within approximately six months after her return to work, Freadman received two salary increases in the amounts of $5,000 and $4,700, for a total salary of $80,000. She received these raises at the election of Smith, her supervisor. In February 2000, Smith gave Freadman a rating of "5," the highest possible performance rating, in her review. This rating was higher than the rating Freadman had received before the onset of her illness. Freadman was also selected in 2000 to participate in a program for the development of high-performing, non-officer employees. Smith had nominated her for the program.

In March 2000, one of Freadman's subordinates left Metropolitan. Freadman spoke to Smith about replacing this employee, noting that the subordinate was her "top performer." Freadman explained that she was already working nights and weekends on EDB, and she expressed her belief that she would not be able to keep the project on track without impairing her health, unless she could replace the departed employee. Although there was a company-wide hiring freeze, Smith arranged for Freadman to hire a replacement. Freadman hired someone to fill the position, and that employee worked for Freadman through June 2000.

In May 2000, Metropolitan's CEO, Catherine Rein, asked Freadman to give a high-profile presentation on EDB to the Officers' Strategic Planning Group on June 9, 2000. Freadman was under the supervision of Cawley, Smith's superior, for this project, and Cawley had authority to make changes in her presentation. In an e-mail dated May 31, 2000, Freadman asked Cawley for his views on the presentation.

Freadman's ulcerative colitis became active again in June 2000. This led to an important conversation, the significance of which is at issue in this appeal. Freadman stated that on June 2, 2000, she advised Smith that she was working too hard, and that she "needed to take some time off because [she was] starting not to feel well." Freadman also told Smith that "some of [her] symptoms may be returning." According to Freadman, Smith responded by saying, "Just get through the presentation on June 9. Take your time off after. Keep it up. You're doing great. Everything is going excellent."[1]

It is undisputed that Freadman was not any more explicit than the words quoted. She did not explicitly request a postponement of the June 9 presentation, which the CEO of the

---

[1] Smith denies that Freadman ever told him that she was sick prior to the June 9 presentation. He does, however, remember a conversation in early June in which Freadman mentioned that she was nervous about giving the June 9 presentation before CEO Rein and the officer group. Smith says he responded by saying, "Michele, you have been through this before, hang in there, you will do great. Just stay calm; you will get through it."

-5-

company had requested. She did not explicitly say that she wanted time off before the June 9 presentation. She did not explicitly state that her ulcerative colitis had returned and that she needed to be accommodated immediately.

Further, it is undisputed that when Smith expressed confidence in her and suggested she take time off after the presentation, she did not say to him that she needed time off before the presentation. Nor did she raise the topic again with Smith or anyone else. Nor was there any physical manifestation obvious to others that Freadman should not have been working between June 2 and June 9.

After this litigation started, in an answer to an interrogatory, Freadman explained that she "believed that [she] could not take any time off as a result of this meeting with Mr. Smith" because she would be "viewed as a complainer and a liability." She alleges that she feared punishment and retaliation. She did not, however, raise these concerns with anyone at the company at any time.

On June 7, 2000, Cawley stopped by Freadman's cubicle to look at Freadman's work on the June 9 presentation on EDB. Freadman does not allege that her illness impaired her ability to prepare for this meeting, or that it affected her ability to request an accommodation on June 7. During the June 7 meeting, Cawley was critical of the slides Freadman had prepared and told

her to shorten the presentation. Cawley was concerned about making good use of the officers' time and wanted to leave half an hour for the officers to talk about their products in light of the presentation. Freadman asked Cawley what she should remove from the presentation. Cawley responded that it was her job to decide which slides to cut.[2] Smith, who was present at this meeting, testified that Cawley had suggested to Freadman that the presentation had too many slides, that the individual slides were too busy, and that Freadman needed to shorten the presentation and simplify the slides. Lyndalu Pieranunzi, a Metropolitan employee subordinate to Freadman who was present throughout the meeting, confirmed that there had been a discussion about shortening the presentation and streamlining the content. Pieranunzi also testified that there was tension between Freadman and Cawley during the meeting.

After the meeting with Freadman, Cawley reiterated to Smith that Freadman's presentation was too busy and contained too many slides. Later that night, Freadman telephoned Smith, who advised her to shorten the presentation and clean up the slides, as Cawley had suggested.

---

[2] The parties dispute whether Freadman, in response to Cawley's instruction that the presentation be shortened, tossed her presentation on the desk in Cawley's direction and demanded that he tell her what to remove, as defendant maintains. It is also disputed whether Cawley specifically told Freadman to remove breakout sessions from the presentation she had planned. We take the evidence in Freadman's favor.

On June 9, 2000, Freadman gave her presentation to the Officers' Strategic Planning Group. Freadman had the officers participate in breakout sessions, and the presentation was longer than Cawley wanted. Due to time constraints, Cawley intervened and ended the breakout sessions early. Freadman noted that Cawley was upset when he shortened the presentation. Smith, who attended the presentation, remembered the introduction going longer than he had expected it would, based on the instructions Cawley had given Freadman. Pieranunzi, who assisted Freadman on the day of the presentation, testified that they "ran out of time."

Metropolitan's CEO, Rein, testified that she was surprised that Freadman used breakout sessions at the strategic planning meeting. Shortly after the presentation, Cawley explained to Rein that he had instructed Freadman in advance of the presentation not to hold breakout sessions.

On the next business day, June 12, 2000, Freadman went into the office. Smith stopped by her cubicle that day and said, "I thought you were going to take some time off." Freadman responded that she was going to take the rest of the week off, and that she would use some personal days as she was "not feeling well." Smith agreed to this plan. Freadman worked at home for the remainder of that week.

On June 12, Cawley told Smith that he "could not rely upon [Freadman] to do what he told her to do at a high profile

-8-

environment . . . [,] that he didn't want her to be the project manager on something that would put her in that position," and that she should be rotated into another position. Smith recommended Freadman for a vacant position in the Desktop Life Cycle Management Program, and Cawley accepted this recommendation.

After June 9, Cawley twice spoke with Metropolitan's Vice President of Human Resources about rotating Freadman into a new position. Cawley explained that Freadman had ignored his instructions to alter her presentation and remove breakout sessions from the agenda.

Freadman worked from home until June 26, 2000, an extra week beyond the period upon which she and Smith had agreed. On June 26, Freadman advised her administrative assistant that she would again work from home that day, due to her illness. Later that day, Smith called Freadman and told her she needed to come into the office. Freadman responded that she was still feeling sick, and she asked if she could come in the next day. According to Freadman, Smith then said, "No, you have to come in the office today. You have two choices. You go out on disability or you come in the office. There's changes in the department that affect you."

Freadman went into the office on June 26 and met with Smith. Smith advised her that her job function was being rotated, and that she would now be working on the Desktop Life Cycle Management Program under Richard Sitkus. Freadman would now be

reporting to Joann Kraemer, a manager two levels below Smith. Also, her new position was in a technical, not a management, area. Freadman met with Sitkus, the head of her new project, and he informed her that he was moving her cubicle closer to him so that everyone on the team could be together. Freadman remained at work for the rest of the day, and then took personal time off the next two days. She was hospitalized on June 29, 2000, and was in and out of the hospital for approximately ninety days for treatment of her ulcerative colitis. Freadman never returned to her new position.

## II.

Freadman brought suit in December 2001 against Metropolitan under the ADA and under state law. She alleged that she had been discriminated against on account of her disability in July 1999 when she was assigned to the EDB project, as well as in June 2000 when she was assigned to the Desktop Life Cycle Management Program. Freadman also claimed that Metropolitan failed to provide reasonable accommodations around the time of her medical leave in 1999 and during the recurrence of her illness in June 2000. Further, she alleged that Metropolitan retaliated against her for requesting accommodations. Freadman also brought several claims against Metropolitan for disability-related discrimination in violation of state law. See Rhode Island Fair Employment Practices Act (FEPA), R.I. Gen. Laws §§ 28-5-1 to -42; Rhode Island

Civil Rights of Individuals with Handicaps Act (RICRIHA), id. §§ 42-87-1 to -5. She sought declaratory and injunctive relief, as well as compensatory and punitive damages, alleging that Metropolitan's conduct caused her to suffer great physical injury and pain of body, emotional distress, humiliation, indignity, and economic losses.

After discovery, Metropolitan moved for summary judgment, arguing that Freadman had failed to make out a prima facie case of disparate treatment, failure to accommodate, or retaliation. Metropolitan argued, inter alia, that Freadman's June 2, 2000 and June 26, 2000 conversations with Smith did not constitute requests for reasonable accommodations, that there was no causal connection between Freadman's disability and the alleged adverse employment action, and that in any event Freadman had failed to rebut Metropolitan's evidence that the change in her duties was motivated by legitimate business reasons.

The magistrate judge issued a report and recommendation recommending that Metropolitan's motion for summary judgment be granted. On plaintiff's disparate treatment claims, the magistrate judge assumed that Freadman would be able to show that she suffered from a disability within the meaning of the ADA[3] and that she was nevertheless able to perform the essential functions of her job

---

[3] The magistrate judge noted that the ADA, FEPA, and RICRIHA are similar statutes, and applied the analysis applicable under the ADA to Freadman's state law claims.

with or without a reasonable accommodation. The magistrate judge also assumed, without deciding, that the change in plaintiff's duties in June 2000 constituted a materially adverse employment action.[4] The magistrate judge found, however, that Freadman had failed to present "any evidence which would enable a rational jury to find that the reassignment of her duties in June 2000 was based, either in whole or in part, on her alleged disability." Further, the magistrate judge stated that a rational jury would not have been able to find that Metropolitan's explanation for the change in Freadman's duties in June 2000 was a pretext for disability discrimination. On plaintiff's reasonable accommodation claims, the magistrate judge again assumed that Freadman would be able to demonstrate that she was disabled and that she was able to perform the essential functions of her job with or without a reasonable accommodation. The magistrate judge concluded, however, that Freadman had not met her burden of showing that Metropolitan, despite knowing of plaintiff's disability, failed to reasonably accommodate it; in particular, he faulted plaintiff for not making sufficiently direct and specific requests for accommodation in June 2000.[5] Finally, on plaintiff's retaliation claims, the magistrate

---

[4] With respect to plaintiff's July 1999 disparate treatment claim, the magistrate judge found that plaintiff had not suffered a materially adverse employment action.

[5] The magistrate judge found that plaintiff had not met her burden of showing that her requested accommodation in May 1999 was reasonable. He additionally found that plaintiff could not show

judge held that the change in Freadman's duties in June 2000 had not been ordered in retaliation for any protected activity under the ADA.[6]

Freadman objected to the magistrate judge's conclusions regarding her disparate treatment, failure to accommodate, and retaliation claims, but only with respect to events occurring in June 2000.

The district court granted Metropolitan's motion for summary judgment. The court agreed with the magistrate judge that Freadman had failed to show causation on her prima facie case of disparate treatment. Freadman, 2006 WL 346455, at *5-6. The court also held that Freadman had failed on June 2 to articulate a request that was linked to her disability or that was specific enough to communicate a request for immediate leave. Id. at *2-3. It further held that Freadman's request on June 26 to come into work the next day also was insufficiently linked to her disability. Id. at *4. Finally, the district court agreed with the magistrate judge that Freadman's retaliation claims must fail because her requests did not constitute protected activity. Id. at *6-7.

Freadman appeals from the grant of summary judgment.

that Metropolitan had failed to accommodate a request in March 2000.

[6] The magistrate judge noted that plaintiff could not establish a prima facie case as to retaliation in July 1999 because this change in Freadman's duties did not constitute a materially adverse employment action.

III.

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." Ingram v. Brink's, Inc., 414 F.3d 222, 228-29 (1st Cir. 2005). We may affirm the grant of summary judgment on any ground supported by the record. Estades-Negroni v. Assocs. Corp. of N. Am., 377 F.3d 58, 62 (1st Cir. 2004).

A.        ADA Disparate Treatment Claim

The ADA prohibits discrimination against "a qualified individual with a disability because of the disability of such individual in regard to . . . terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

We apply here the burden-shifting framework articulated by the Supreme Court in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999); Dichner v. Liberty Travel, 141 F.3d 24, 29-30 & n.5 (1st Cir. 1998). If the plaintiff

establishes a prima facie case,[7] the burden then shifts to the defendant to "articulate a legitimate, non-discriminatory reason for its employment decision and to produce credible evidence to show that the reason advanced was the real reason." Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 105 (1st Cir. 2005). If the defendant offers a legitimate, non-discriminatory reason, the initial inference of discrimination evaporates, Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991), and the burden then shifts back to the plaintiff to "proffer evidence to establish that [the defendant's] non-discriminatory justification is mere pretext, cloaking discriminatory animus," Tobin, 433 F.3d at 105. The employer's burden of articulating a non-discriminatory reason is only a burden of production, not a burden of persuasion; the burden of proving unlawful discrimination rests with the plaintiff at all times. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000); Dichner, 141 F.3d at 30.

Freadman argues that Metropolitan violated the ADA by removing her from the EDB project on June 26. On appeal, she asserts that the district court erred in holding that she did not

---

[7] To satisfy the requirements of a prima facie case of disparate treatment, a plaintiff must establish that (1) she suffers from a disability or handicap, as defined by the ADA; (2) she was nevertheless able to perform the essential functions of her job, either with or without reasonable accommodation; and (3) the defendant took an adverse employment action against her because of, in whole or in part, her protected disability. Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 104 (1st Cir. 2005).

-15-

establish a prima facie case of disability discrimination because she failed to show causation. We bypass the prima facie case issue because it is clear that plaintiff has not mustered enough evidence for a reasonable jury to conclude that Metropolitan's stated reason for her job rotation was pretextual. See Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996) ("On summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus.").

Metropolitan says it removed Freadman from the EDB project because of (1) her behavior during her June 7 meeting with Cawley, (2) her unsatisfactory presentation to the Officers' Strategic Planning Group, and (3) Cawley's resulting loss of confidence in Freadman. It is undisputed that at the June 7 meeting, Cawley expressed concern over the length of Freadman's presentation for June 9 and told her that he wanted it shortened. It is also undisputed that Cawley, after the presentation, concluded that Freadman had not shortened the presentation enough. Freadman herself concedes that Cawley was upset when he ended the June 9 presentation early because of its length. Further, it is undisputed that Cawley told CEO Rein he had instructed Freadman in advance of the presentation not to use breakout sessions, and that

-16-

Rein was surprised that Freadman had done so. There is no evidence that the statement to Rein was motivated by discrimination. It is also undisputed that after the presentation, Cawley told Smith and the Vice President of Human Resources that a new position needed to be found for Freadman because she had ignored his instructions. Whether or not Freadman had explicitly been told to remove the breakout sessions, there is no evidence that Cawley did not genuinely believe that Freadman had violated his instructions, or that his belief was motivated by discrimination.[8] Based on this evidence, it is clear that defendant met its burden of articulating a legitimate, non-discriminatory reason for Freadman's job rotation.

Plaintiff argues that Metropolitan's explanation was pretext. She first points to the temporal relationship between her June 2000 requests and her job rotation. Freadman cites <u>Oliver</u> v. <u>Digital Equip. Corp.</u>, 846 F.2d 103 (1st Cir. 1988), for the proposition that the occurrence of an adverse employment action "soon after" an employee engages in a protected activity is

---

[8] Freadman has not put forward any proof that Cawley's stated dissatisfaction with her conduct was "inaccurate, unbelievable, idiosyncratic, or misleading." <u>Velázquez-Fernández</u> v. <u>NCE Foods, Inc.</u>, 476 F.3d 6, 12 (1st Cir. 2007). Nor is this a case where a decision maker is fed biased information by discriminatory underlings. <u>See</u> <u>Cariglia</u> v. <u>Hertz Equip. Rental Corp.</u>, 363 F.3d 77, 85-88 (1st Cir. 2004).

-17-

"indirect proof of a causal connection between the [adverse employment action] and the activity."[9]  Id. at 110.

Timing may bear on the question of causation in a retaliation claim, but we have also warned that a "narrow focus [on timing may] ignore[] the larger sequence of events and also the larger truth."  Soileau v. Guilford of Me. Inc., 105 F.3d 12, 16 (1st Cir. 1997).  Here, the larger sequence of events shows that the company had accommodated Freadman's requests concerning her ulcerative colitis.  After her return from medical leave, she was allowed to work part-time for several weeks, even though such work was not normally available for managers.  She also received two salary increases shortly after returning to Metropolitan, and in 2000 she was selected to participate in a program for rising stars at the company.  Moreover, Freadman was allowed to hire a replacement when one of her subordinates left Metropolitan, even though there was a company-wide hiring freeze in effect.  Also, the company had given her a performance rating in early 2000 that was higher than the rating she earned before the onset of her illness.

Further, the timing between the June 2 request for time off and the June 26 job rotation does not support a finding of pretext.  There is uncontradicted evidence that the motivation for the change in Freadman's responsibilities lay with Cawley's

_____

[9]    We discuss in the next section whether the June 2 conversation was indeed a protected request for a reasonable accommodation.

interactions with Freadman on June 7 and June 9 and his resulting inability to trust her in a high-profile position. As for the June 26 request to work from home, this request cannot support a finding of pretext because it occurred after the decision to remove Freadman from the EDB project had been made.

The record as a whole demonstrates that the decision to move Freadman into a new position was not causally linked either to her disability or to her June 2000 conversations with Smith. See Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25-26 (1st Cir. 2004) (finding that temporal proximity was sufficient to make out a prima facie case, but affirming dismissal of claim because plaintiff had failed to demonstrate pretext); Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003) ("[C]hronological proximity does not by itself establish causality . . . ."); Soileau, 105 F.3d at 16-17 (acknowledging that discharge occurred immediately after request for accommodation, but concluding that "[t]he larger picture undercuts any claim of causation").

Freadman also attempts to argue that Metropolitan's reasons for removing her from the EDB project are pretextual because Cawley failed to follow Metropolitan's disciplinary policy -- that is, he did not counsel her about the purported misconduct that led to her rotation. There is no evidence that if there was a violation of the discipline policy it was motivated by discrimination. Indeed, the claim that there was a violation is

-19-

undercut by the fact that Metropolitan's policy does not require counseling for "extreme cases[] such as insubordination." Given his dissatisfaction with Freadman's presentation and his lack of confidence in her ability to follow his instructions, Cawley reasonably determined that Freadman's behavior qualified as an "extreme case," and he was thus under no obligation to counsel Freadman regarding her actions or her reassignment. The decision to rotate Freadman into another position without providing counseling "was within the bounds of [Metropolitan's] disciplinary policy and raise[d] no inference of pretext." Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 337 (1st Cir. 2005). There was nothing "idiosyncratic or questionable" about the employer's decision. Gray v. New Eng. Tel. & Tel. Co., 792 F.2d 251, 256 (1st Cir. 1986) (quoting Loeb v. Textron, 600 F.2d 1003, 1012 n.6 (1st Cir. 1979)) (internal quotation marks omitted).

Freadman's disparate treatment claim fails as a matter of law. See Ingram, 414 F.3d at 228-29 (noting that summary judgment cannot be avoided by relying on improbable inferences or conclusory allegations).

B.        ADA Reasonable Accommodation Claims

On appeal, Freadman claims that Metropolitan failed to accommodate her disability on two occasions -- June 2, before her

presentation to the officers group, when she requested time off, and June 26, when she asked to work at home for an additional day.[10]

The definition of discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the] covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the [entity's] business." 42 U.S.C. § 12112(b)(5)(A); see also Higgins, 194 F.3d at 264. In order to survive a motion for summary judgment on a reasonable accommodation claim, the plaintiff must "produce enough evidence for a reasonable jury to find that (1) he is disabled within the meaning of the ADA, (2) he was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [the defendant], despite knowing of [the plaintiff]'s disability, did not reasonably accommodate it." Rocafort v. IBM Corp., 334 F.3d 115, 119 (1st Cir. 2003).

---

[10] The Equal Employment Opportunity Commission (EEOC) has filed an amicus brief on Freadman's behalf, making the limited argument that plaintiff made requests for time off and to work at home, and that these constituted requests for accommodations under the ADA as well as "protected activity" for purposes of the ADA's anti-retaliation provision. While we agree with the EEOC that under certain facts a request for time off or to work at home may constitute a requested accommodation, Freadman's evidence fails to establish that she made requests for reasonable accommodations which were denied by the employer.

-21-

1.      June 2 Request

        Freadman alleges that Metropolitan knew of her disability
yet failed to reasonably accommodate it after she told Smith that
she "needed to take some time off because [she was] starting not to
feel well" and that "some of [her] symptoms may be returning."

        The ADA imposes liability for an employer's failure to
accommodate "known physical or mental limitations" of an employee.
42 U.S.C. § 12112(b)(5)(A) (emphasis added).  Ordinarily, the
employer's duty to accommodate is triggered by a request from the
employee.  Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st
Cir. 2001); see also 1 B. Lindemann & P. Grossman, Employment
Discrimination Law 313 (3d ed. 1996); 1 H. Perritt, Jr., Americans
with Disabilities Act Handbook § 4.17, at 121 (3d ed. 1997).  That
is because "an employee's disability and concomitant need for
accommodation are often not known to the employer."  Reed, 244 F.3d
at 261.  Thus, the plaintiff has the burden of showing that she
"sufficiently requested the accommodation in question."[11]  Id. at
260.  The employee's request (1) "must be 'sufficiently direct and
specific,'" and (2) "must explain how the accommodation requested
is linked to some disability."  Id. at 261 (quoting Wynne v. Tufts

        [11]   Different  rules  may  apply  in  situations  where  a
disability prevents the employee from requesting an accommodation,
or where the need for an accommodation is obvious.  See Reed, 244
F.3d at 261 n.7.  That is not the case here.  There is no evidence
to suggest, and plaintiff does not argue, that her colitis
prevented her from properly requesting an accommodation.

Univ. Sch. of Med., 976 F.2d 791, 795 (1st Cir. 1992)); see also Estades-Negroni, 377 F.3d at 64 (requiring request to be "express" and "linked to a disability").

In addition to making a sufficient request concerning a known limitation, the plaintiff must also show that the proposed accommodation is reasonable -- that it "would enable her to perform the essential functions of her job," and that "at least on the face of things, it is feasible for the employer under the circumstances." Reed, 244 F.3d at 259; see also US Airways, Inc. v. Barnett, 535 U.S. 391, 401-02 (2002); Mulloy v. Acushnet Co., 460 F.3d 141, 148 (1st Cir. 2006).

If the plaintiff can make these showings, the defendant then has the opportunity to show that the proposed accommodation would impose an undue hardship. Reed, 244 F.3d at 259; see also Barnett, 535 U.S. at 402. We need not address the questions of reasonableness or undue hardship because Freadman has failed to show that her request for time off was for time off before the June 9 presentation.

As to the link between Freadman's request and her disability, Freadman and the EEOC argue that there was sufficient evidence for a jury to conclude that Metropolitan knew that Freadman's June 2 request was related to her disability. Metropolitan disputes this. The appropriate inquiry is whether defendant knew or reasonably should have known that the reason for

Freadman's request was her disability. See Wynne, 976 F.2d at 795 (addressing a claim brought under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794).[12]

We agree that there was sufficient evidence to create a triable issue on the link between Freadman's June 2 request and her disabling colitis. Taking the evidence in plaintiff's favor, Smith knew that Freadman took medical leave from March 1999 to July 1999 in order to receive treatment for her colitis. While Freadman was recovering, Smith acknowledged plaintiff's need for more reasonable hours and a better work/life balance. Further, when one of Freadman's subordinates left Metropolitan in March 2000, Freadman notified Smith that she needed to hire a replacement or else risk impairing her health. When Smith responded that there were concerns that the home office was getting too big, Freadman objected, "I'm basically killing myself to keep this [project] on track, and I'm going to get sick again." Smith replied, "I know. I know. All right. All right. Just [hire a replacement] quick." This is not a situation, as in Soileau, where the employer's mere knowledge of medical leave over three years prior was insufficient to put it on notice of a present disability. 105 F.3d at 14, 16.

Freadman's accommodation claim nevertheless founders due to her failure to produce evidence that would permit a jury to

---

[12]    "Claims under Title I of the ADA and § 504 of the Rehabilitation Act are analyzed under the same standards." Phelps v. Optima Health, Inc., 251 F.3d 21, 23 n.2 (1st Cir. 2001).

conclude that the employer was put on notice of a "sufficiently direct and specific" request for her desired accommodation. She argues it was clear that her request was to take time off starting on June 2, rather than at some unspecified time. However, Freadman told Smith that she "needed to take some time off because [she was] starting not to feel well" (emphasis added). Plaintiff expressed merely a need to take "some time off" without specifying when she would need that time off. Freadman, who had better knowledge than Smith of her condition and symptoms, had some burden to be specific about the accommodation she required. See Reed, 244 F.3d at 260-62; see also Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1136-37 (7th Cir. 1996) (recognizing that liability for a failure to accommodate claim may turn on whether "missing information is of the type that can only be provided by one of the parties"). No rational jury could conclude that Smith reasonably should have known that Freadman was requesting time off before the presentation on June 9. The employer has "no duty to divine the need for a special accommodation" where the employee fails to make an adequate request. Reed, 244 F.3d at 261.

Smith, in response to Freadman's request, reasonably suggested that Freadman take time off after the presentation, only a week later. To the extent plaintiff adequately requested time off at some unspecified point in the future, defendant granted a reasonable accommodation. If this was not what Freadman sought,

she could have clarified that she needed time off immediately. She never did so.

There was no transgression of the employer's responsibility to help determine what would constitute a reasonable accommodation. The federal regulations implementing the equal employment provisions of the ADA state:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3). "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation." Id. pt. 1630, app. § 1630.9.[13] The employer has an obligation upon learning of an employee's disability to "engage in a meaningful dialogue with the employee to find the best means of accommodating that disability." Tobin, 433 F.3d at 108. The employee also has an obligation: "The appropriate

---

[13] The EEOC's interpretive guidance on Title I of the ADA, 29 C.F.R. pt. 1630, app., "'while not controlling upon the courts by reason of [its] authority, do[es] constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 672 (1st Cir. 1995) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986)).

-26-

reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. pt. 1630, app. § 1630.9; see also Calero-Cerezo, 355 F.3d at 24.

Here, there was an informal process. But Freadman failed to be sufficiently specific, and Metropolitan granted the request it thought had been made. Under the circumstances, Metropolitan offered plaintiff a reasonable accommodation, and Freadman cannot now argue that the company should have offered something different. Cf. Webster v. Methodist Occupational Health Ctrs., Inc., 141 F.3d 1236, 1238 (7th Cir. 1998) ("An employee cannot refuse reasonable accommodations during the interactive process . . ., and then after dismissal suggest something different . . . .").

In a final attempt to salvage the June 2 reasonable accommodation claim, Freadman -- but not the EEOC – argues that her failure to clarify her request was excusable due to intimidation: she believed she would be punished if she pursued her request for time off. We reject plaintiff's proposition that employees who make requests have no obligation to further clarify their needs once the employer offers an accommodation the employee believes is insufficient. There may well be instances in which an employee has made a clear request, the employer has denied the accommodation or offered an unsatisfactory accommodation, the employee has become too intimidated to continue seeking a satisfactory accommodation,

-27-

and the employer reasonably should have understood that dynamic. This will depend on the particular facts of the case. Here, plaintiff has not made a plausible, objective case of intimidation. See Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 515 (1st Cir. 1996); accord Beck, 75 F.3d at 1135-36. Before June 2, Metropolitan had granted Freadman several months of time off for treatment of her ulcerative colitis. The employer even made exceptions to company work rules and hiring freezes. Moreover, Smith had given Freadman two raises and a high performance evaluation since her return from medical leave in 1999. Smith did in fact reasonably respond to the request made of him. No reasonable juror could find that there was intimidation so as to excuse Freadman from clarifying her request. Summary judgment in favor of Metropolitan on Freadman's June 2 reasonable accommodation claim is appropriate.

2.      June 26 Request

Freadman alleges that Metropolitan knew of her disability, yet failed to reasonably accommodate it, when on June 26 she informed Smith that she was still feeling sick and then asked if she could work from home an additional day. Smith's response was, "No, you have to come in the office today. You have two choices. You go out on disability or you come in the office. There's changes in the department that affect you."

Freadman decided to go into the office rather than go out on disability. She explained that "no one wants to go out on disability unless . . . they absolutely have to," and she additionally explained that "normally, you have to use a certain number of sick days prior to going out on disability." Smith, for his part, said that he had told Freadman, "[I]f you are not feeling well, then you should consider taking, you know, [paid time off] or going out on disability; if you are going to work, whether it's from home or in the office, then you need to come in."

It is far from clear that any accommodation claim can be maintained when an employee argues she should not, after having taken unauthorized leave, be put to the choice of taking disability leave or coming into the office to arrange working at home. Further, Freadman does not claim to have suffered any particular harm from going into the office on June 26.

If this claim is meant to color the June 2 accommodation claim, it adds nothing. Metropolitan's response to the June 26 request was entirely reasonable.

If the claim is meant to demonstrate that Freadman was entitled to work at home,[14] it was still reasonable for the employer

---

[14] Freadman has made no effort, however, to show that she could have performed the essential functions of her job at home. See Mulloy, 460 F.3d at 148; Kvorjak v. Maine, 259 F.3d 48, 55 (1st Cir. 2001); Reed, 244 F.3d at 259; see also Feliciano v. Rhode Island, 160 F.3d 780, 785 (1st Cir. 1998) ("The ADA does not require an employer to accommodate a disability by foregoing an essential function of the position or by reallocating essential

to have her come into the office to arrange that.

Summary judgment on the June 26 failure to accommodate claim is affirmed.

C.      ADA Retaliation Claim

Freadman alleges that her June 2 and June 26 requests for accommodation constituted protected conduct, and that as a result of these requests, she suffered an adverse employment action when she was rotated out of the EDB project.

The ADA's retaliation provision states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). Requesting an accommodation is protected conduct for purposes of the ADA's retaliation provision. Wright, 352 F.3d at 478. An ADA plaintiff may assert a claim for retaliation even if she fails to succeed on a disability claim. Soileau, 105 F.3d at 16.

To establish a claim of retaliation, a plaintiff must show that (1) she engaged in protected conduct, (2) she suffered an adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse employment action. Wright, 352 F.3d at 478; Calero-Cerezo, 355 F.3d at 25.

Plaintiff's retaliation claim fails. Even assuming that Freadman engaged in protected conduct and suffered an adverse

functions to make other workers' jobs more onerous.").

employment action, she has not shown a causal connection between her June 2000 requests and her job rotation on June 26. No reasonable juror could find that Freadman's June 2 conversation with Smith had any bearing on Cawley's decision to change her job responsibilities. Further, no causation can be established based on the June 26 request to work from home, as this request occurred after Cawley had made the decision to remove Freadman from the EDB project. We affirm summary judgment for Metropolitan on Freadman's retaliation claim.

## IV.

For the reasons stated above,[15] the district court's entry of summary judgment for Metropolitan is <u>affirmed</u>. Costs are awarded to defendant.

---

[15]     Plaintiff does not appeal from entry of summary judgment on her FEPA and RICRIHA claims under Rhode Island law.